NATIONAL BOULEVARD BANK, Special Adm'r of the Estate of Evelyn Seidler, Deceased, Plaintiff-Appellant, v. GEORGETOWN LIFE INSURANCE COMPANY, Defendant-Appellee.

First District (1st Division)   No. 83—240

Opinion filed September 17, 1984.—Rehearing denied January 8, 1985.

William J. Harte, Ltd., James P. Chapman & Associates, Ltd., and Roan & Grossman, all of Chicago (James P. Chapman, Frank J. Roan, William J. Harte, and John B. Austin, of counsel), for appellant.

Kirkland & Ellis, of Chicago (Francis B. Libbe and John E. Angle, of counsel), for appellee.

PRESIDING JUSTICE BUCKLEY delivered the opinion of the court:

The case before us involves a controversy concerning the right of the estate of a life insurance beneficiary to the proceeds of two insurance policies. The original plaintiff, Evelyn Seidler, brought an action against defendant Georgetown Life Insurance Company to recover, as beneficiary, the proceeds of two life insurance policies issued by Georgetown on the life of her deceased brother Jacob Grossman. Seidler subsequently died, and National Boulevard Bank & Trust Company, special administrator of her estate, was substituted as plaintiff. Plaintiff's complaint consisted of two counts—count I pertained to policy No. 9130, while count II concerned policy No. 9283. Trial was held on count I, and the jury found in favor of defendant. Plaintiff appeals from the judgment entered on the jury's verdict and from the denial of its post-trial motion. As to count II, the trial court granted plaintiff's motion for summary judgment, awarding damages

of $1,000,000 plus prejudgment interest of $416,000. Defendant's motion to vacate the judgment was denied, and defendant appeals. For the reasons set forth below, we affirm the trial court as to count I, and reverse and remand as to count II.

The record reveals that on March 24, 1973, the decedent Jacob Grossman applied for a $1,000,000 life insurance policy on his life from defendant Georgetown Life Insurance Company. Decedent was assisted in preparation of his application by Harold Gaffney. Defendant's brief describes Gaffney as the insurance agent of the decedent, while plaintiff's brief refers to Gaffney as an agent for Georgetown. Gaffney testified that he works with businessmen and farmers in financial planning, which includes the procurement of life insurance. Gaffney stated that he represented the prospective insured in the procurement of life insurance and also that he had known the decedent since 1968 or 1969.

The decedent's application for insurance policy No. 9130 provided in pertinent part:

> "It is agreed: (1) the Company shall incur no liability under this application until it has been received and approved, a policy has been issued and delivered, and the full first premium specified in the policy has been actually paid to and accepted by the Company while health, habits and occupation of the Proposed Insured remain as described in this application ***."

During the course of the application procedure, the decedent signed two "Statements to the Medical Examiner" forms and underwent physical examinations by two physicians, Drs. Horacio Rivero and Seymour Goldberg. Each physician executed an "Attending Physician's Statement." Decedent's signed application, his signed "Statements to the Medical Examiner" and the "Attending Physician's Statements" were then submitted for evaluation to defendant Georgetown and, in turn, by defendant to Republic National Life Insurance Company (Republic), defendant's re-insurer.

In addition to the signed application and the signed accompanying statements, decedent's various medical records were reviewed by defendant's underwriters for evaluation of the risk of insuring decedent's life. There was no evidence in decedent's medical records, nor revealed by his examinations, which indicated that decedent suffered from any underlying heart disease. However, several factors, including an elevated blood cholesterol level and the death of his mother at age 57 from heart disease, led to a conclusion that the decedent was among a class of people who were susceptible to occlusive vascular disease. Thus, it was determined that he probably had a diminished

life expectancy. Therefore, upon the condition that decedent be rated as a higher risk, and thus pay a higher premium, Republic agreed to re-insure defendant, and defendant thereafter issued policy No. 9130 to decedent in the amount of $1,000,000 on June 19, 1973.

The record further discloses that in April 1973, approximately one month after signing the insurance application, the decedent was hospitalized in the intensive care unit of a Billings, Montana, hospital for what the attending physician, Dr. Ross Lemire, diagnosed and told decedent was a heart attack. Dr. Lemire later testified that decedent had suffered an "acute septal myocardial infarction," which is the death of a heart muscle and which results in a shortened life expectancy. Decedent remained hospitalized in Montana from April 27 through May 11, 1973. During this hospitalization, the decedent, in telephone conversations with his Bloomington, Illinois, family doctor, Dr. Edgar Stevenson, requested that the fact of his heart attack not be disclosed. Decedent told Dr. Stevenson that he wanted people to think he was hospitalized because of a skiing accident.

Subsequent to his Montana hospitalization, decedent returned to Bloomington, where he began receiving out-patient treatment for his heart ailment from Dr. Stevenson. This care continued through November 13, 1973, two days before decedent died.

On July 19, 1973, Harold Gaffney delivered insurance policy No. 9130 to decedent. Gaffney testified that at no time did decedent reveal the fact of his April 1973 heart attack and subsequent medical care. When the policy was delivered, decedent signed the receipt which said that the policy had been delivered and fully explained. Gaffney also stated that decedent read the application.

On July 21, 1973, two days after the delivery of policy No. 9130, the decedent, again through Gaffney, applied for a second $1,000,000 life insurance policy from defendant. Gaffney consulted an underwriter for defendant, Sally Bouton, to determine whether additional medical examinations were necessary in view of the short time which had elapsed since the decedent was examined by Drs. Rivero and Goldberg for policy No. 9130. Bouton decided that since the medical examinations decedent underwent for policy No. 9130 were sufficiently recent, no further examinations were necessary. Gaffney then gave decedent an application for policy No. 9283. This application contained several medical questions which were, by the terms of the application, to be answered when no medical examination was required. Gaffney did not ask decedent the questions, and instead he wrote the words "already examined" on the application for the second policy. Decedent then signed the application. Policy No. 9283 was later deliv-

ered to decedent with his signed application attached to it. Neither at that time, nor at any time prior to his death, did decedent reveal to Gaffney or to defendant his April 1973 heart attack or subsequent treatment.

The decedent died on November 15, 1973, at age 38. The cause of death was stated as a coronary occlusion and acute heart failure. Subsequently, Evelyn Seidler, decedent's sister, sought recovery from defendant Georgetown as beneficiary under policy Nos. 9130 and 9283. When defendant declined to pay the proceeds of either policy, Seidler filed a two-count complaint. Count I sought recovery under policy No. 9130, and count II sought recovery under policy No. 9283. Defendant, in its amended answer, raised affirmative defenses to both counts, which alleged in pertinent part that decedent had failed to disclose in his application material information concerning his health and that decedent failed to disclose to defendant the deterioration of his health between the time of his application and the delivery of the policies.

Both parties subsequently moved for summary judgment as to each count. The trial court granted summary judgment in defendant's favor as to count I. This ruling, however, was reversed by this court and the cause was remanded for trial on the merits. (*Seidler v. Georgetown Life Insurance Co.* (1980), 82 Ill. App. 3d 361, 402 N.E.2d 666.) Thereafter, the case proceeded to trial on count I, and the jury delivered a verdict in favor of defendant. Plaintiff's motion to set aside the verdict was denied, and plaintiff now appeals the verdict.

With regard to count II, a summary judgment in defendant's favor was subsequently vacated by a successor judge. When the case was called for trial, a third judge granted plaintiff's motion for summary judgment. The court awarded $1,000,000 in damages and $416,000 in prejudgment interest. Defendant's motion to vacate the summary judgment was denied, and defendant now appeals.

## I

■ We initially address plaintiff's argument that the jury's verdict on count I in favor of defendant should be reversed and the cause remanded for a new trial or, alternatively, that judgment should be entered for plaintiff on count I. At the trial of count I, defendant raised two affirmative defenses involving (1) decedent's failure to inform defendant of his 1973 heart attack, and (2) decedent's failure to disclose a myocardial infarction or coronary occlusion he suffered in 1962. Plaintiff's argument on appeal pertains primarily to these af-

firmative defenses. Specifically, plaintiff contends: (a) to the extent that the jury's verdict rested on a finding that decedent's 1973 undisclosed heart attack was a newly-contracted disease, the verdict was against the manifest weight of the evidence; (b) to the extent that the jury's verdict rested on decedent's failure to disclose his 1962 myocardial infarction or coronary occlusion, decedent made no material misrepresentation and there was no reliance by defendant; (c) the trial court erred in giving jury instruction No. 2 and by failing to direct a finding as to the affirmative defenses; and (d) plaintiff was prejudiced by certain comments made by defense counsel in closing argument.

### A

To the extent that the jury's verdict on count I was based on the finding that decedent's 1973 heart attack was a newly-contracted disease, we find sufficient evidence in the record to support the verdict. When count I previously was before this court, we held that if the 1973 heart attack was a newly-contracted disease, as opposed to a maturation of a preexisting disease, decedent had a legal as well as contractual obligation of disclosure to defendant. (*Seidler v. Georgetown Life Insurance Co.* (1980), 82 Ill. App. 3d 361, 368, 402 N.E.2d 666.) The question of whether decedent's 1973 heart attack was a maturation of a preexisting heart disease or a newly-contracted disease was a question of fact for the jury. (82 Ill. App. 3d 361, 369.) We therefore remanded the cause regarding policy No. 9130 with instructions that further expert testimony on this question be taken.[1]

Plaintiff argues that there was insufficient evidence to support a finding that the 1973 myocardial infarction was a newly-contracted disease. Plaintiff notes that its two experts, Drs. Joseph Messer and Jean Maurice Pouget, testified that the heart attack was a maturation of a preexisting coronary artery disease. Messer also testified, however, that the buildup of cholesterol in the coronary arteries begins early in life, even as early as childhood; almost everyone shows some signs of this buildup, *i.e.*, atherosclerosis. Dr. Messer stated that in fact it would not have been unusual for decedent to have had some atherosclerosis when he applied for life insurance. We further note that Dr. Pouget testified that from all the records which were available to the insurance company, there was no convincing and definite medical evidence that decedent had significant, underlying coronary artery disease. He also stated that decedent's statements to the medi-

---

[1]The fact issue raised by the 1962 heart attack, discussed below, was not before this court in *Seidler*.

cal examiners prior to the application were no longer true after he suffered his myocardial infarction in April 1973.

Dr. John Tobin, defendant's expert, testified that although the 1973 myocardial infarction, in all likelihood, was the result of coronary artery disease, the myocardial infarction is itself a disease because it is a specific entity in medicine. Dr. Tobin testified that the myocardial infarction was a new condition of disease, *i.e.*, the death of an area of decedent's heart muscle which materially altered his life expectancy. He stated that a myocardial infarction is a distinct and definite clinical illness. Dr. Tobin disagreed with the opinion of plaintiff's experts that a myocardial infarction is not a newly-contracted disease, but a manifestation of a preexisting disease.

Dr. Ross Lemire, who treated decedent for the 1973 myocardial infarction, testified that a myocardial infarction causes the death of some of the heart tissue and that he told decedent he had suffered a heart attack. Dr. Lemire also stated that when a person has suffered a myocardial infarction, there are definite new changes of a pathological nature which can be detected in the heart muscle, and that such a heart attack is a new process superimposed, or secondary to, a damaged or diseased coronary artery. He added that a myocardial infarction was a new condition beyond the arteriosclerosis of the coronary vessel, and was a material change in the health of the heart.

We believe there was a sufficient basis upon which the jury could find that the 1973 myocardial infarction was a newly-contracted disease. At most, plaintiff has shown that there was conflicting evidence, raising the possibility that the jury could have reached a different verdict. This court, however, will not set aside a jury's determination merely because the jury could have reached a different conclusion. (*Pietka v. Chelco Corp.* (1982), 107 Ill. App. 3d 544, 437 N.E.2d 872.) Rather, the jury's determination as to questions of fact is not to be disturbed on appeal unless it is clearly and palpably against the manifest weight of the evidence. (*Stephenson v. Dreis & Krump Manufacturing Co.* (1981), 101 Ill. App. 3d 380, 428 N.E.2d 190.) For a judgment to be against the manifest weight of the evidence, it must appear that conclusions opposite to those reached by the trier of fact are clearly evident. (*J.R. Sinnott Carpentry, Inc. v. Phillips* (1982), 110 Ill. App. 3d 632, 443 N.E.2d 597.) Here, we cannot conclude that the jury's determination was against the manifest weight of the evidence.

## B

To the extent the jury's verdict on count I rested on dece-

dent's nondisclosure of his 1962 heart attack, the verdict was not against the manifest weight of the evidence. The record reveals that decedent's 1962 coronary occlusion or myocardial infarction was unknown to defendant or to Dr. Charles Lodowski, the medical director of defendant's re-insurer Republic, when evaluating decedent's application for policy No. 9130. Notwithstanding that the application specifically inquired as to whether the applicant ever had heart disease, in decedent's application the only reference to any occurrence in 1962 was the following information submitted by Dr. Seymour Goldberg in his "Statements to the Medical Examiner" form:

> "In 1962 following a long hard weekend during which he set a state record in swimming applicant complained of fatigue and aching. He saw Dr. A. E. Livingston of Bloomington, Ill. who hospitalized him for two days for a complete survey including x-rays and EKG. He shortly after went to see Dr. Hoffman at Mayo Clinic who also did a complete survey and *all findings normal*. No recurrence of above." (Emphasis added.)

Hence, although the application contained the fact that decedent set a swimming record, it failed to include the 1962 diagnosis of the coronary occlusion.

Among the other documents reviewed by Dr. Lodowski was a report by Dr. Harry N. Hoffman at Mayo Clinic dated April 12, 1967. In the report Dr. Hoffman stated that decedent said "he had some chest symptoms in 1962 which resulted in a brief period of hospitalization and some expressed concern regarding his heart." The report proceeded to relate, however, that decedent disclaimed any chest pain for two years and could ski, water ski and climb several flights of stairs without dyspnea, chest pain or any other cardiac symptoms. Dr. Hoffman reviewed the examination and tests taken of decedent in 1967 at Mayo Clinic, and stated that "[decedent's] nose was externally deviated to the right with a narrow lumen on the left side. Otherwise the examination was essentially normal." He added that the electrocardiogram was "entirely normal." The report also indicated that decedent's 1962 electrocardiograms were reviewed and that an exercise test was given. Dr. Hoffman stated that the 1962 electrocardiograms were nondiagnostic and that the exercise test was normal. Based on the foregoing report, decedent's application, all of the latter cardiograms and the reports of the medical examinations performed just prior to decedent's application, Dr. Lodowski approved decedent for life insurance with a rating.

What Dr. Lodowski did not have before him, however, and what he was unaware of, was plaintiff's Exhibit No. 12, which was a two-

page history and progress report from Brokaw Hospital in Normal, Illinois, dated August 28, 1962. The report disclosed that decedent had complained of occasional chest pains, and it contained a final diagnosis of "coronary occlusion subacute." Dr. Lodowski testified that had he been informed of this diagnosis, he would have rendered an opinion that decedent was "unacceptable."

Defendant's expert, Dr. Tobin, testified that the above diagnosis was actually an inferior wall myocardial infarction, *i.e.*, an infarct in a different area of the heart than the area affected by the 1973 heart attack. Dr. Tobin stated that it would not be unusual for the 1962 infarct to fail to show up in the electrocardiograms performed at Mayo Clinic and other places from 1967 to March 1973, because following a myocardial infarction, enzymes are activated which digest the dead heart muscle and then scar tissue forms. Over a period of time, if the damaged area is not too large, later electrocardiograms may appear completely normal.

Based on the foregoing evidence, we find there was ample support for a determination by the jury that decedent's nondisclosure of his 1962 coronary occlusion or myocardial occlusion was a material misrepresentation relied upon by defendant. We note that plaintiff argues that decedent's failure to reveal his 1962 coronary occlusion could not have been intentional, and even if intentional, defendant should be charged with not discovering it. Plaintiff has cited five cases from other jurisdictions dealing with misrepresentations which interpret the law of those jurisdictions, but not the law of Illinois. These cases are inapplicable here because, as plaintiff acknowledges, Illinois has a statute which specifically applies to misrepresentations, intentional or unintentional, in insurance contracts. (Ill. Rev. Stat. 1983, ch. 73, par. 766.) The statute's provisions are to be read in the disjunctive, so that either an actual intent to deceive *or* a material misrepresentation which affects either the acceptance of the risk or the hazard to be assumed can defeat or avoid the policy. (*Campbell v. Prudential Insurance Co.* (1958), 16 Ill. App. 2d 65, 71-72, 155 N.E.2d 9; *Hatch v. Woodmen Accident & Life Co.* (1980), 88 Ill. App. 3d 36, 40, 409 N.E.2d 540.) It has been further held that an insurance company need not make any independent investigation and may rely on the truthfulness of answers contained in the insurance application where, as here, there is nothing to put it on notice that certain answers may be false. *Apolskis v. Concord Life Insurance Co.* (7th Cir. 1971), 445 F.2d 31, 36, citing *Metropolitan Life Insurance Co. v. Moravec* (1905), 214 Ill. 186, 188, 73 N.E. 415.

## C

■ Plaintiff next assigns error to the giving of instruction No. 2, which instructed the jury as to the two above-mentioned affirmative defenses raised by defendant Georgetown. The record reveals, however, that plaintiff made no objection to the instruction at trial nor in its post-trial motion, but rather completely acquiesced at trial to the giving of the instruction. A reviewing court will not consider an alleged error in the giving of instructions unless specific objections have been made in the trial court. (*Jensen v. Chicago & Western Indiana R.R. Co.* (1981), 94 Ill. App. 3d 915, 932, 419 N.E.2d 578.) Further, an argument not raised in a post-trial motion is waived and cannot be considered on appeal. (*Burgdorff v. IBM* (1979), 74 Ill. App. 3d 158, 162, 392 N.E.2d 183; 87 Ill. 2d R. 366(b)(2)(iii).) Hence, this issue is not properly before the court.

■ Plaintiff also alleges that the trial court erred in failing to direct a finding as to either or both of the affirmative defenses. The record shows no motion by plaintiff for such a directed verdict or finding at the close of defendant's evidence, nor does plaintiff's post-trial motion allege that the court wrongfully denied any such motion. As such, this issue also is waived for purposes of review.

## D

■ Finally, plaintiff objects to certain comments by defense counsel during closing argument. In his closing argument, defense counsel reviewed the evidence indicating that decedent had a risk of incurring atherosclerosis, calling it a condition that "we all have some [of] or most of us do; it's an ongoing process." He then stated:

> "What do they [plaintiff] suggest, that on the basis of what we had we should say, Mr. Grossman, we can't give you insurance; you can't have any, you are uninsurable?
>
> Well, then nobody can get insurance *** [w]e all have something that may eventually—
>
> [Objection not sustained],"

and then continued

> "All right. We all have susceptibilities or will have in our lifetime to diseases, to sicknesses, to weaknesses of organs. If anybody who applies for insurance and may have arteriosclerosis can't get it, then nobody gets any.
>
> [To which an objection was sustained and the jury instructed to disregard the last comment by counsel for the defendant.]"

Plaintiff contends the above comments were bound to bring the jurors' self-interest into play because, in effect, defense counsel was indica-

ting that a verdict for plaintiff would render virtually everyone uninsurable, including the jurors.

We find no error as to this matter. The record reveals that plaintiff's counsel previously had stated in his own closing argument that, although decedent was found to be in a group more susceptible to occlusive vascular disease, defendant "took his money, and they took the risk." Counsel for plaintiff also argued that the affirmative defense based on the 1962 coronary occlusion or myocardial infarct was the "last gasp of this insurance company." These remarks implied that defendant should not have taken the premium and then engaged in a "last gasp" effort to avoid the policy. Defendant was entitled to respond as to why it insured plaintiff. The remarks of defense counsel were intended to demonstrate to the jurors what the result would be if, due to a condition to which almost everyone is susceptible, life insurance in any form was denied. Moreover, the court's action in sustaining the second objection to the comments, in our opinion, rendered harmless any error that might have arisen as a result of these statements when considered in the context of the entire trial. *Funk v. Venture Stores, Inc.* (1981), 94 Ill. App. 3d 115, 121, 418 N.E.2d 498.

## II

■ We next turn to defendant Georgetown's argument that the trial court erred in granting summary judgment for the plaintiff as to count II and denying defendant's renewed motion for summary judgment as to that count, which sought recovery under policy No. 9238. The trial court awarded plaintiff damages in the amount of $1,000,000 on count II, plus prejudgment interest of $416,000. Defendant maintains that the record precluded summary judgment for plaintiff.

The record reveals that decedent applied for the second $1,000,000 life insurance policy from defendant only two days after the delivery of policy No. 9130 and only two months after his second heart attack. The application was made once again through Harold Gaffney; however, decedent never mentioned his recent heart attack to Gaffney. Gaffney consulted an underwriter for defendant, Sally Bouton, to determine whether additional medical examinations were necessary in view of the short time which had elapsed since decedent was examined by Drs. Rivero and Goldberg for policy No. 9130. Bouton decided that the medical examinations which decedent underwent for policy No. 9130 were sufficiently recent and that further examinations would not be necessary.

The application for policy No. 9238 contained several medical questions which were numbered 11 through 16. These questions were

preceded by the instructions:

> "For non-medical, all questions must be answered. If Annuity, or examined, omit questions 11 to 16 inclusive."

Question 11b asks:

> "Does Proposed Insured now have or has had *** disease of heart or circulatory system?"

In the space opposite medical questions 11 through 16, Gaffney wrote the words "already examined." Decedent then signed the application which contained the following language:

> "Each of the undersigned declares that he has read the questions and answers contained herein and that the answers are *complete and true* to the best of his knowledge and belief and he offers them and the following agreements to the company as a consideration for the insurance applied for." (Emphasis added.)

Policy No. 9283 was later delivered to decedent with his signed application attached to it. It is uncontroverted that neither at that time, nor at any time before his death, did decedent reveal his April 1973 heart attack or his subsequent treatment to defendant. Gaffney testified during his deposition that he did not know that decedent suffered a heart attack in April 1973, and that, had he known, he would not have "wasted his time" with the second policy.

It is defendant's contention that when decedent represented in the medical history portion of his application that the words "already examined" were "complete and true," he not only withheld the information concerning his April 1973 heart attack, but he also perpetrated the myth that his physical condition was no different than it had been when he was previously examined. Defendant maintains that the words "already examined" were misleading because the language necessarily referred to the examinations performed by Drs. Rivero and Goldberg prior to the issuance of the first policy and prior to decedent's heart attack, since those were the only examinations that were performed. Although the words were literally true in the sense that decedent had been previously examined, defendant contends the legend was at best a half-truth because no reasonable person considering the import of the statement could conclude anything other than that decedent was representing to defendant that his state of health was the same as it was when the examinations took place, and was asking defendant to evaluate the risk for the second policy on that basis. Defendant asserts that such a representation thus was not "true and complete," since decedent suffered a heart attack subsequent to the examinations and had been under continuous medical treatment

thereafter for that condition until his death in November of that year.

Defendant urges that, based on the foregoing facts and circumstances, at the very least a question of fact exists as to whether policy No. 9238 is avoidable under section 154 of the Insurance Code. (Ill. Rev. Stat. 1983, ch. 73, par. 766.) As noted previously herein, section 154 is to be construed, as written, in the disjunctive, so that a misrepresentation appearing in the application for an insurance policy may defeat or avoid the policy if it (1) is made with actual intent to deceive, or (2) it materially affects either the acceptance of the risk or the hazard assumed by the company. (*Campbell v. Prudential Insurance Co.* (1958), 16 Ill. App. 2d 65, 71-72, 155 N.E.2d 9; *Hatch v. Woodmen Accident & Life Co.* (1980), 88 Ill. App. 3d 36, 40, 409 N.E.2d 540.) The materiality and truth or falsity of representations are questions of fact to be resolved by a jury (*Weinstein v. Metropolitan Life Insurance Co.* (1945), 389 Ill. 571, 577, 60 N.E.2d 207), as is the question of intent (*Ehret v. Loyal Protective Life Insurance Co.* (1969), 112 Ill. App. 2d 289, 294, 251 N.E.2d 101). Materiality is determined by the question whether reasonably careful and intelligent men would have regarded the fact stated as substantially increasing the chances of the event insured against, so as to cause a rejection of the application or different conditions. (*Weinstein v. Metropolitan Life Insurance Co.* (1945), 389 Ill. 571, 577, 60 N.E.2d 207.) Incomplete answers or the failure to disclose material information in response to a question in an application may constitute a material misrepresentation. *Unger v. Metropolitan Life Insurance Co.* (1968), 103 Ill. App. 2d 150, 156, 242 N.E.2d 907.

Here, after carefully examining the arguments and authorities set forth by both parties, we believe that, based on the record before us, neither party is entitled to summary judgment. Minimally, a genuine issue of fact exists as to whether the policy may be avoided under section 154. In our opinion, it is for the trier of fact to determine whether decedent, in his application, made a misrepresentation of fact as to his health with the actual intent to deceive or which materially affected the acceptance of the risk or the hazard assumed by defendant.

We note that plaintiff argues decedent was excused from disclosing his heart attack because defendant did not specifically ask him to update his medical condition and elected to rely on the words "already examined." This argument is unpersuasive, however, since decedent not only represented that he had already been examined, but also represented that his answers were "complete and true to the best of his knowledge and belief." Defendant contends, and we agree,

that when the words "already examined" were used as an alternative to answering the specific medical questions in the application, it was reasonable to assume that decedent was representing to defendant that his answers to those questions were unnecessary because defendant already possessed all the pertinent information concerning his health. Defendant was at least entitled to have a jury determine whether decedent made a material misrepresentation.

None of the authorities cited by plaintiff support the granting of summary judgment in its favor. Plaintiff relies heavily upon *Peterson v. Manhattan Life Insurance Co.* (1910), 244 Ill. 329, 91 N.E. 466. There, the applicant wrote "has not been sick" in response to a question seeking information about which doctors he had seen and for what diseases. The evidence revealed that the applicant failed to disclose a nervous disease affecting his muscles. The applicant later died from acute tuberculosis of the lungs. The reviewing court, in a *per curiam* opinion, determined that the policy should not be invalidated for breach of warranty based on the above answer, reasoning first that the undisclosed illness was a mere temporary ailment which yielded readily to treatment and, secondly, that the answer was unresponsive and thus not a warranty. The reviewing court, however, refused to grant judgment outright for the plaintiff, but remanded the cause for a new trial. *Peterson* thus supports defendant's contention that the instant cause should at least proceed to trial. Moreover, we note that the *Peterson* decision is nearly 75 years old and predates by almost 30 years the enactment of section 154, the first statute in Illinois governing misrepresentations and warranties in insurance contracts. The more modern cases involving alleged misrepresentations by insurance applicants have made it clear that the applicant has the duty to act in good faith toward his potential insurer in an attempt to make a full and complete disclosure of all relevant information. (*Carroll v. Preferred Risk Insurance Co.* (1966), 34 Ill. 2d 310, 215 N.E.2d 801; *Tesluk v. Metropolitan Life Insurance Co.* (1970), 130 Ill. App. 2d 290, 264 N.E.2d 566; *Apolskis v. Concord Life Insurance Co.* (7th Cir. 1971), 445 F.2d 31, 35 (applying Illinois law).) The applicant cannot be the judge of the materiality of his health problems; he must disclose all information known to him and permit the insurer to determine its materiality. *Weinstein v. Metropolitan Life Insurance Co.* (1945), 389 Ill. 571, 578, 60 N.E.2d 207.

Plaintiff also places much reliance on *Marshall v. Metropolitan Life Insurance Co.* (1950), 405 Ill. 90, 90 N.E.2d 194. There, the insured's application for his first policy of life insurance stated that he had not previously suffered from "any ailment or disease of the heart

or lungs." While this application was pending, the insured was advised by his physician that he had developed a serious heart disorder. The first policy was then delivered by the insurance company's agent who, at that time, attempted to sell the insured an additional policy of $5,000; the insured initially resisted, but then compromised and purchased a $2,000 policy. When the policy was delivered, it was accompanied by a copy of the application made for the first policy and a document designated as "Application Amendment." The amendment recited that the original application was amended so as to stand as the application for the second policy. No inquiry was made by the insurer as to the change of status since the date of the original application. On review, the question presented as to the second policy was whether the amendment should be read as of its own date or whether it should relate back to the date of the original application; if it related back, the insured's estate would recover. In affirming the jury's verdict in favor of the insured, the reviewing court found the language in the amendment ambiguous, and construed it against the insurer. In so holding, however, the court emphasized that

> "[u]nder such circumstances, it seems to be clear the insured had no desire or thought of misrepresentation of material facts ***." (*Marshall v. Metropolitan Life Insurance Co.* (1950), 405 Ill. 90, 102.)

In essence, the reviewing court in *Marshall* found the jury's determination that no misrepresentation occurred was not contrary to the manifest weight of the evidence. Here, unlike *Marshall*, it is not clear that the insured "had no desire or thought of misrepresentation of material facts." Further, there was no factual resolution in this case by the trier of fact as to this matter.

Plaintiff also cites several cases where the applications containing the alleged misrepresentations were not attached to the insurance policy. (*E.g., Economy Fire & Casualty Co. v. Thornsberry* (1978), 66 Ill. App. 3d 225, 383 N.E.2d 780; *Inter-Insurance Exchange v. Milwaukee Mutual Insurance Co.* (1978), 61 Ill. App. 3d 928, 378 N.E.2d 391.) In these cases, it was held that pursuant to section 154 of the Insurance Code an insurer cannot rely on misrepresentations in an application unless the application is attached to the policy. In the present case, it is not disputed that the application containing the alleged misrepresentation upon which defendant relied was indeed attached to policy No. 9238.

We briefly note that defendant contends that a question of fact additionally exists as to whether decedent's failure to reveal his April 1973 heart attack violated the standard of good faith, openness and

candor which is required in the negotiation for life insurance. (*Carroll v. Preferred Risk Insurance Co.* (1966), 34 Ill. 2d 310, 215 N.E.2d 801.) We believe that the issue of good faith is necessarily encompassed under the issue pertaining to section 154 of the Insurance Code and, thus, it need not be presented to the jury as a distinct issue.

Finally, it is axiomatic that summary judgment is a drastic remedy and is to be awarded only if the right of the movant is clear and free from doubt. (*A. S. Schulman Electric Co. v. Village of Fox Lake* (1983), 115 Ill. App. 3d 746, 450 N.E.2d 1356.) If fair-minded persons could draw more than one conclusion or inference from the facts, including one unfavorable to the summary judgment movant, the motion for summary judgment should be denied. *Estate of Kern v. Handelsman* (1983), 115 Ill. App. 3d 789, 450 N.E.2d 1286.

Applying these principles to the facts herein, we believe that the granting of summary judgment for plaintiff was erroneous. We note that summary judgment initially had been granted for defendant, but this order was subsequently vacated by a second judge, and a third judge later rendered summary judgment for plaintiff. Given that three different trial court judges arrived at three different conclusions regarding the propriety of summary judgment, it can hardly be said that plaintiff's right to this remedy is free from doubt.

For the reasons set forth above, the judgment of the trial court is affirmed as to count I, and the summary judgment in favor of plaintiff on count II is reversed and the cause is remanded for further proceedings consistent with this opinion.

Affirmed in part; reversed in part; and remanded.

GOLDBERG and CAMPBELL, JJ., concur.*

---

*This opinion was adopted as the opinion of the court prior to the retirement of Justice Goldberg.