# Illinois Official Reports

## Supreme Court

---

**Illinois State Bar Ass'n Mutual Insurance Co. v. Law Office of Tuzzolino & Terpinas,**
**2015 IL 117096**

---

Caption in Supreme
Court:

ILLINOIS STATE BAR ASSOCIATION MUTUAL INSURANCE
COMPANY, Appellant, v. LAW OFFICE OF TUZZOLINO AND
TERPINAS *et al.*, Appellees.

Docket No.

117096

Filed

February 20, 2015

Held
(*Note: This syllabus
constitutes no part of the
opinion of the court but
has been prepared by the
Reporter of Decisions
for the convenience of
the reader.*)

The common law doctrine of "innocent insured" could not preserve
legal malpractice coverage as to a member of a two-man law firm
whose policy was properly rescinded under the Insurance Code for the
other attorney's misrepresentation in applying for renewal of the
firm's coverage.

Decision Under
Review

Appeal from the Appellate Court for the First District; heard in that
court on appeal from the Circuit Court of Cook County, the Hon. Rita
M. Novak, Judge, presiding.

Judgment

Appellate court judgment reversed.
Circuit court judgment affirmed.

Counsel on
Appeal

J. Timothy Eaton, of Taft Stettinius & Hollister LLP, and Robert Marc Chemers and Scott L. Howie, of Pretzel & Stouffer, Chtrd., all of Chicago, for appellant.

C. Jeffrey Thut, of Roach, Johnston & Thut, and Christopher M. Cano, of Franco & Moroney, LLC, all of Libertyville, for appellees.

David S. Osborne, of Lindsay, Rappaport & Postel, LLC, of Chicago, for *amicus curiae* Property Casualty Insurers Association of America.

Justices

JUSTICE FREEMAN delivered the judgment of the court, with opinion.
Chief Justice Garman and Justices Thomas, Karmeier, Burke, and Theis concurred in the judgment and opinion.
Justice Kilbride dissented, with opinion.

## OPINION

¶ 1    Plaintiff Illinois State Bar Association Mutual Insurance Company (ISBA Mutual) filed a complaint for rescission and other relief against the Law Office of Tuzzolino & Terpinas (firm); Sam Tuzzolino and Will Terpinas, Jr., partners in the firm; and Anthony "Antonio" Coletta, the plaintiff in an underlying legal malpractice action against Tuzzolino, Terpinas and the firm. In its complaint, ISBA Mutual sought rescission of the legal malpractice insurance policy it had issued to the firm, alleging that Tuzzolino's material misrepresentation on an ISBA Mutual renewal application induced ISBA Mutual to issue the policy. Ruling on motions for summary judgment, the circuit court of Cook County granted ISBA Mutual's motion and rescinded the policy. Terpinas and Coletta appealed that judgment, arguing the rescission should not apply to Terpinas. The appellate court agreed and reversed the judgment of rescission as to Terpinas. 2013 IL App (1st) 122660, ¶¶ 38, 46. This court allowed ISBA Mutual's petition for leave to appeal. Ill. S. Ct. R. 303 (eff. June 4, 2008); R. 315 (eff. July 1, 2013). We now reverse the judgment of the appellate court and affirm the judgment of the circuit court.

¶ 2                                    I. BACKGROUND

¶ 3    In the underlying legal malpractice action, Coletta alleged that Tuzzolino and the firm represented either Coletta or his home construction business in various legal matters from 2002 to 2008, and that Tuzzolino mishandled some of those matters, including the "Baja litigation." According to Coletta's amended complaint, beginning in 1998 he invested more than $500,000 through his construction company in a limited liability company known as Baja Chicago LLC, which operated a Chicago nightclub. By the time Baja Chicago LLC ceased operations in

2002, Coletta had lost more than $1 million, prompting him to file suit in Lake County against other venturers in the LLC. Tuzzolino, through the law firm he shared with Terpinas, initiated the lawsuit on Coletta's behalf in 2003. However, Tuzzolino allegedly failed to timely disclose expert witnesses that were expected to testify as to valuation issues, which resulted in an order *in limine* barring that testimony. Tuzzolino also allegedly failed to retain an expert witness specializing in forensic accounting to help determine the amount of money allegedly taken or siphoned from the LLC by other venturers. After his valuation witnesses were barred, Tuzzolino allegedly advised Coletta to settle the suit for less than $30,000, an amount far less than Coletta's losses on the Baja investment. The Baja litigation was dismissed with prejudice in November 2005. However, even after that dismissal, Tuzzolino allegedly told Coletta that settlement negotiations were continuing. Tuzzolino allegedly signed settlement documents on behalf of Coletta and his construction company without informing Coletta.

¶ 4 Tuzzolino also allegedly suggested that Coletta try to recover his losses by suing the lawyer who handled a Baja bankruptcy in 1999. Tuzzolino filed a legal malpractice action against the bankruptcy lawyer at the end of 2005, but the case was dismissed six months later (June 22, 2006) on the ground that it was barred by the statute of repose for legal malpractice claims. Coletta alleged Tuzzolino failed to inform him that the suit had been dismissed, allowing Coletta to believe it was proceeding toward trial. Coletta alleged that in February 2008, after he learned the case had been dismissed, he confronted Tuzzolino with that knowledge. According to Coletta, Tuzzolino offered to pay him $670,000 to settle any potential claim for legal malpractice arising out of Tuzzolino's work on the suits against the Baja coventurers and the bankruptcy attorney. Coletta alleges this sum was never paid.

¶ 5 Less than three months later, shortly before the April 30, 2008, expiration of the firm's 2007-08 legal malpractice policy with ISBA Mutual, Tuzzolino completed a Renewal Quote Invoice and Acceptance Form for the purchase of a policy meant to cover the firm during the 2008-09 policy year. Question No. 4 on the form asked: "Has any member of the firm become aware of a past or present circumstance(s), act(s), error(s) or omission(s), which may give rise to a claim that has not been reported?" Tuzzolino checked the "no" box corresponding to this question. He signed his name as "owner/partner" and dated the form April 29, 2008, beneath the following statement:

> "I/We affirm that after an inquiry of all the members of the applicant firm that all the information contained herein is true and complete to the best of my/our knowledge and that it shall be the basis of the policy of insurance and deemed incorporated therein upon acceptance of this application by issuance of a policy."

The form is stamped "received" by ISBA Mutual on May 2, 2008. ISBA Mutual issued the firm a Lawyers Professional Liability Insurance Policy (No. IL 111168 6), to be effective May 1, 2008, through May 1, 2009.

¶ 6 Terpinas allegedly learned of Tuzzolino's malfeasance about a month later, on June 10, 2008, when he received a lien letter from an attorney representing Coletta. Terpinas immediately reported the claim to ISBA Mutual.

¶ 7 In March 2009, ISBA Mutual brought suit seeking rescission and other relief against Tuzzolino, Terpinas, the firm, and Coletta. Count I of the complaint, as finally amended, sought rescission of the entire policy (IL 111168 6) on the ground that Tuzzolino's material misrepresentation voided the contract. ISBA Mutual alleged it "relied to its detriment on the

continuing misrepresentations of material fact made by Tuzzolino, with the knowledge that those misrepresentations were, in fact, untrue as to his knowledge of any circumstance, act, error or omission that could result in a claim." In count II, ISBA Mutual contended, in the alternative, that it had no duty or obligation to defend Tuzzolino or the firm in connection with the claims made by Coletta against them.

¶ 8    In January 2010 ISBA Mutual moved for summary judgment on all counts of its amended complaint. In June 2010 the circuit court entered summary judgment against Tuzzolino as to count II of the complaint, after Tuzzolino agreed to the entry of judgment against him. The court found that ISBA Mutual had no duty or obligation to defend Tuzzolino against Coletta's claims.[1]

¶ 9    In July 2012, following a hearing on pending summary judgment motions, the circuit court granted ISBA Mutual's motion, denied defendants' motions, and rescinded the policy. The court also found ISBA Mutual had no duty to defend Terpinas or the firm against Coletta's action.

¶ 10    Terpinas and Coletta, but not the firm, appealed that judgment, arguing that Terpinas was an "innocent insured" who was not to blame for Tuzzolino's misrepresentation and the policy should not have been rescinded as to him. The appellate court agreed with that argument and reversed the judgment of rescission as to Terpinas. 2013 IL App (1st) 122660, ¶¶ 38, 46. Though the court held that the policy's own innocent insured clause could not be the basis for avoiding rescission, it nonetheless concluded that a common law "innocent insured doctrine" applied to misrepresentations made on the renewal application. *Id*. ¶¶ 22-25, 38. The court held that this doctrine preserved Terpinas's coverage even as Tuzzolino's was properly rescinded. *Id*. ¶ 38.

¶ 11    ISBA Mutual appeals to this court. Additional pertinent background will be discussed in the context of our analysis.

¶ 12                                    II. ANALYSIS

¶ 13    The question presented is whether Illinois law allows rescission of an insurance policy in its entirety for a material misrepresentation on the written application. Plaintiff ISBA Mutual answers this question in the affirmative, arguing that section 154 of the Illinois Insurance Code (215 ILCS 5/154 (West 2008)) allows complete rescission where, as here, the misrepresentation materially affects the acceptance of the risk by the insurer, and thus goes to the formation of the contract. Defendants disagree, arguing that while rescission might be appropriate for Tuzzolino, it is unfair and against public policy to rescind insurance coverage for Terpinas, an innocent insured who had no knowledge of Tuzzolino's misdeeds and the alleged misrepresentation.

¶ 14    Summary judgment is appropriate when "the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." 735 ILCS 5/2-1005(c) (West 2010). The purpose of summary judgment is not to try a question of fact, but to determine whether a genuine issue of material fact exists. *Adams v. Northern Illinois Gas*

---

[1] Tuzzolino was disbarred "on consent" on November 12, 2010. In re Sam Tuzzolino, No. 09-CH-0076.

*Co.*, 211 Ill. 2d 32, 42-43 (2004). A circuit court's entry of summary judgment is reviewed *de novo. Standard Mutual Insurance Co. v. Lay*, 2013 IL 114617, ¶ 15; *Rich v. Principal Life Insurance Co.*, 226 Ill. 2d 359, 370 (2007).

¶ 15    Section 154 of the Insurance Code provides:

"No misrepresentation or false warranty made by the insured or in his behalf in the negotiation for a policy of insurance, or breach of a condition of such policy shall defeat or avoid the policy or prevent its attaching unless such misrepresentation, false warranty or condition shall have been stated in the policy or endorsement or rider attached thereto, or in the written application therefor. No such misrepresentation or false warranty shall defeat or avoid the policy unless it shall have been made with actual intent to deceive or materially affects either the acceptance of the risk or the hazard assumed by the company." 215 ILCS 5/154 (West 2008).

¶ 16    We note, initially, that section 154 expressly refers to misrepresentations "made by the insured or in his behalf"—that is, not necessarily by the insured personally.

¶ 17    The section also sets forth a two-prong test for determining if the policy may be rescinded. First, the statement must be false, and second, it either must have been made with an actual intent to deceive or must "materially affect the acceptance of the risk or hazard assumed by the insurer." *Golden Rule Insurance Co. v. Schwartz*, 203 Ill. 2d 456, 464 (2003). "The statute's provisions are to be read in the disjunctive, so that either an actual intent to deceive *or* a material misrepresentation which affects either the acceptance of the risk or the hazard to be assumed can defeat or avoid the policy." (Emphasis in original.) *National Boulevard Bank v. Georgetown Life Insurance Co.*, 129 Ill. App. 3d 73, 81 (1984). This court has recognized that section 154 permits rescission for an innocent misrepresentation. "Under the statute, therefore, a misrepresentation, even if innocently made, can serve as the basis to void a policy." *Golden Rule*, 203 Ill. 2d at 464. If the misrepresentation materially affects the insurer's acceptance of the risk, it does not matter that one of the parties, or an insured, might not have been to blame for the misrepresentation. "In other words, it is unnecessary for the insurer to prove that a misrepresentation was made with the intent to deceive if it was material to the risk assumed." *Ratcliffe v. International Surplus Lines Insurance Co.*, 194 Ill. App. 3d 18, 25 (1990).

¶ 18    ISBA Mutual asserts that the misrepresentation in the case at bar meets the section 154 requirements: "Even if the misrepresentation had not been made with the intent to deceive, it materially affected the insurer's acceptance of the risk, as ISBA Mutual would not have renewed the policy had Tuzzolino truthfully answered the question and disclosed his knowledge of a potential claim." According to ISBA Mutual, because the misrepresentation materially affected its acceptance of the risk, it is grounds for rescission under the statute.

¶ 19    Defendants disagree. They do not dispute that the misrepresentation here materially affected the acceptance of the risk. Instead, defendants focus on the impact that rescission would have on Terpinas, an innocent insured who did not cooperate or contribute to a loss. According to defendants, it would be "patently unfair in this case to rescind insurance coverage to Terpinas, when he had absolutely no knowledge of his partner's misdeeds and the alleged misrepresentation on the insurance renewal invoice." Defendants invoke public policy, asserting that ISBA Mutual's contention that section 154 permits the rescission of the policy here "is contrary to the well-established public policy of the State of Illinois." According to

defendants, section 154 "is not a sword to be utilized to vitiate insurance coverage; rather it is a shield that must be utilized to protect insureds and the public."[2]

¶ 20 In keeping with their emphasis on public policy, defendants assert the appellate court below correctly applied the common law innocent insured doctrine in this case. The appellate court, which also cited policy concerns (*e.g.*, 2013 IL App (1st) 122660, ¶¶ 35-36), concluded the innocent insured doctrine preserved coverage for Terpinas (*id.* ¶ 38). The common law innocent insured doctrine operates in cases where there are two or more insureds on a policy, and it allows an insured who is innocent of wrongdoing to recover despite the wrongdoing of other insureds. See *Vasques v. Mercury Casualty Co.*, 947 So. 2d 1265, 1268 (Fla. Dist. Ct. App. 2007). Illinois cases applying the "innocent insured" doctrine typically involve arson or vandalism where an innocent insured seeks recovery under a policy that includes an exclusion for intentional acts. *E.g.*, *Wasik v. Allstate Insurance Co.*, 351 Ill. App. 3d 260, 267 (2004) (plaintiff, an innocent insured, was entitled to recover losses he sustained because of fire started by his stepson). Defendants here argue that the reasoning of these cases is nevertheless equally applicable to Terpinas under the circumstances in this case.

¶ 21 In analyzing the innocent insured doctrine, the appellate court below relied principally on *Economy Fire & Casualty Co. v. Warren*, 71 Ill. App. 3d 625 (1979), which defendants here also cite.

¶ 22 The insurer in *Warren* had paid a property settlement for fire damage to a home jointly owned by its insureds, a married couple, only to learn later that the wife had claimed to have set the fire deliberately. The insurer sought to rescind the settlement and recover the settlement proceeds it had paid to both insureds. *Id.* at 626. Amid claims that the wife suffered from mental illness, there were factual disputes as to whether she really had set the fire and even whether she had claimed to have done so. But it was undisputed that her husband was not to blame for the fire, making him an "innocent" insured. *Id.* at 629. *Warren* held that the arson of the wife should not be imputed to the innocent husband so as to bar his recovery of one-half the proceeds of the settlement.

¶ 23 Because the dispute in *Warren* arose after the settlement had been paid, the case involved rescission of the settlement agreement. But, as ISBA Mutual correctly notes, *Warren* is not therefore a rescission case that would apply to the case at bar. *Warren* is not about the rescission of an insurance policy, and consequently does not invoke section 154 of the Insurance Code. The insurer in *Warren* sought rescission of the settlement agreement on the ground that there was no *coverage* for the damages it had compensated—specifically, that one insured's intentional act precluded coverage for another insured who was innocent of that act.

¶ 24 Such coverage cases usually involve the enforcement of policy exclusions, typically exclusions for intentional acts allegedly committed by an insured other than the one challenging the exclusion. The innocent insured doctrine makes sense in that context because

---

[2]Defendants appear to suggest a tension between section 154 and public policy. However, as this court has noted, statutes themselves form an important part of Illinois's public policy. "The public policy of the state is found in its constitution, its statutes, and its judicial decisions. [Citations.] In relation to the judicial branch, the General Assembly, which speaks through the passage of legislation, occupies a superior position in determining public policy." *Reed v. Farmers Insurance Group*, 188 Ill. 2d 168, 174-75 (1999). In ISBA Mutual's view, "[s]ection 154 itself refutes the notion that the rescission of the ISBA Mutual policy is against public policy."

the insured's innocence is relevant to whether an intentional act invokes an exclusion to coverage. But the innocent insured doctrine appears irrelevant to rescission, a recognized remedy for even innocent misrepresentations.

¶ 25    ISBA Mutual points to *Home Insurance Co. v. Dunn*, 963 F.2d 1023 (7th Cir. 1992), which observed that rescission of an insurance policy because of a misrepresentation on the application is distinctly different from the denial of insurance *coverage* because of excluded wrongdoing. This is a "subtle, but important" distinction, the court observed, in that excluded conduct might bar coverage for a claim arising from that conduct, but a misrepresentation in the application broadly affects the validity of the policy as a whole. *Id*. at 1026.

¶ 26    Rather than the innocent insured doctrine, *Dunn* concerned a "waiver of exclusion" clause in the policy that the insurer sought to rescind. That clause mirrored the innocent insured doctrine in that it reflected the insurer's agreement not to enforce the policy's "wrongful acts" exclusions as to any insured " 'who did not personally commit or personally participate in committing one or more of the acts, errors, omissions or personal injuries described in any such exclusion or condition.' " *Id*. at 1025 (quoting the insurer's waiver-of-exclusion clause). Like the innocent insured doctrine, the waiver-of-exclusion clause preserved coverage for those insureds who were innocent of the wrongdoing.

¶ 27    *Dunn* involved a "crooked attorney" who obtained a legal malpractice policy for himself and the other attorneys associated with his firm, but "understandably" failed to disclose his own criminal activities on the policy application. One of the other attorneys in the firm, who had no involvement in the policy application or his colleague's misrepresentation, was sued for legal malpractice unrelated to his colleague's criminal activities. The insurer sought rescission of the policy due to the material misrepresentation on the application. The insured who was not involved in the misrepresentation, as well as the underlying malpractice plaintiffs, objected to the rescission of the policy as to that attorney, relying on the waiver-of-exclusion provision. *Id*.

¶ 28    But the Seventh Circuit found it irrelevant that no other attorney in the firm took part in the crooked attorney's fraud, or even knew of it. "Though the other attorneys did not intend to deceive, the falsehood on the application is fatal. [The crooked attorney's] misrepresentation caused [the insurer] to issue a policy to all the attorneys that otherwise would not have been forthcoming." *Id*. at 1026. The version of section 154 then in effect allowed rescission of the policy. *Id*.

¶ 29    ISBA Mutual argues that the reasoning of *Dunn* applies to the case at bar. Though Terpinas might have been innocent of the misrepresentation on the renewal application, that is irrelevant to rescission, which focuses on the *effects* of the misrepresentation, rather than on the innocence or guilt of the individual. The important thing, ISBA Mutual asserts, is that, as a result of the misrepresentation, ISBA Mutual issued the policy under a false impression about its exposure to risk.

¶ 30    We agree with ISBA Mutual that the rationale for applying the innocent insured doctrine to questions of policy exclusions and insurance coverage is absent from the rescission context. Unlike in rescission cases, the innocence of an insured matters a great deal when another insured's wrongdoing triggers a policy exclusion, and a dispute arises over whether the insurer has a duty to defend the innocent insured under a policy that undisputedly was in effect. That is the setting in which the innocent insured doctrine is relevant.

¶ 31    But issues of insurance coverage, governed by common-law rules concerning the interpretation of policy language, are significantly different from the question of whether an insurance policy should be enforced in the first place—an issue that is governed by statute, and is not concerned with whether an insured is innocent of a misrepresentation that prejudices the insurer. In the case of a misrepresentation that materially affects the acceptance of the risk, the issue is the effect of that misrepresentation on the validity of the policy as a whole. A misrepresentation on the policy application goes to the formation of the contract. The innocent insured doctrine, on the other hand, has a narrower focus, typically dealing with situations where an insured's wrongdoing triggers a policy exclusion, and the question is whether the insurer has a duty to defend the innocent insured under a policy that is still in effect.

¶ 32    We agree with ISBA Mutual that the appellate court erred in applying the innocent insured doctrine in this case. As ISBA Mutual correctly notes, that doctrine is relevant to issues of policy exclusions and insurance coverage, but it is unsuited to the case at bar, which deals with rescission and contract formation.

¶ 33    We also agree with ISBA Mutual that the appellate court erred in partially severing the policy to facilitate the application of the innocent insured doctrine.

¶ 34    The policy's severability clause states:

"The APPLICATION, and any addendum or supplements, and the Declarations, are the basis of this Policy. The particulars and statements contained in the APPLICATION will be construed as a separate agreement with and binding on each INSURED. Nothing in this provision will be construed to increase the COMPANY'S Limit of Liability."

¶ 35    As ISBA Mutual notes, while the severability clause creates a separate agreement with each insured, it states that each separate agreement is made up of the "particulars and statements contained in the APPLICATION," binding on each insured. The statements contained in the application include the false statement that no member of the firm was aware of the potential for a then-unreported claim. Even if the policy is treated as a separate contract with each insured, there is nothing to permit the application—or the misrepresentation it contains—to be split off from any individual contract.

¶ 36    Defendants also argue that it is impossible to return Terpinas to his status quo existing at the time the contract for insurance was made. Defendants cite *International Insurance Co. v. Sargent & Lundy*, 242 Ill. App. 3d 614, 629 (1993), for the proposition that rescission of a contract generally requires that the parties be placed in their positions existing when the contract was made. Defendants assert that the status quo at the time the contract was made was that Terpinas was covered by a policy of professional liability insurance. In defendants' view, returning Terpinas to his status quo would mean he should actually have coverage by ISBA Mutual.

¶ 37    ISBA Mutual disagrees, arguing that the requirement of restoring the parties to their pre-contract status has consistently been interpreted as requiring only that the party seeking rescission must return any benefits it has received. ISBA Mutual asserts that, as part of its claim for rescission, ISBA Mutual refunded the premium it had received for the policy, "restoring the *status quo ante* in the only respect that law or equity requires."

¶ 38    ISBA Mutual adds that, even if it were not possible to return the parties to the status quo *ante* in some relevant respect, "defendants' own authority refutes their contention that this

would preclude rescission of the ISBA Mutual policy." ISBA Mutual quotes *Sargent & Lundy*, which states:

> "Where such restoration is impossible, *** it does not necessarily preclude granting of rescission. Restoration of the status quo *ante* will not be required when restoration has been rendered impossible by circumstances not the fault of the party seeking rescission, and the party opposing the rescission has obtained a benefit from the contract." *Id.*

¶ 39        ISBA Mutual asserts that defendants do not suggest that ISBA Mutual " 'created an impediment' to the court's ability to restore the status quo *ante*." *Id.* at 629-30 (quoting *Klucznik v. Nikitopoulos*, 152 Ill. App. 3d 323, 328 (1987)). ISBA Mutual adds that Terpinas benefitted from the policy by being able to practice as a member of a limited liability company for several months. According to ISBA Mutual, Terpinas acknowledges in his brief that this is something he could do only because his firm could claim to be covered under the ISBA Mutual policy.

¶ 40        Finally, defendants argue that the renewal form containing the material misrepresentation was not an "application" under section 154. ISBA Mutual responds, initially, that defendants themselves, in their brief, refer to the renewal form as a "renewal application." Moreover, the form refers to itself as an "application," and it requires an attestation to the validity of answers on behalf of the "applicant firm." Further proving that the form is an application, it states that ISBA Mutual "reserves the right to withdraw or amend the quoted terms at any time prior to the proposed effective date of coverage."

¶ 41        In sum, we agree with ISBA Mutual that section 154, which establishes public policy on this issue, allows rescission when the relevant requirements are met, and here those requirements were satisfied. The circuit court correctly rescinded the ISBA Mutual policy in its entirety, and the appellate court erred in applying the innocent insured doctrine and partially severing the policy to preserve coverage for Terpinas.

¶ 42                                        III. CONCLUSION

¶ 43        We reverse the judgment of the appellate court and affirm the circuit court's judgment rescinding the ISBA Mutual policy in its entirety.

¶ 44        Appellate court judgment reversed.

¶ 45        Circuit court judgment affirmed.

¶ 46        JUSTICE KILBRIDE, dissenting:

¶ 47        The majority finds the innocent insured doctrine does not apply, because "that doctrine is relevant to issues of policy exclusions and insurance coverage, but it is unsuited to the case at bar, which deals with rescission and contract formation." *Supra* ¶ 32. I would apply the innocent insured doctrine here. Terpinas had a reasonable expectation that he maintained professional liability insurance based on his history with ISBA Mutual and his lack of culpability in the misrepresentation. Terpinas further reasonably relied on Illinois Supreme Court Rules 721 and 722, because the firm was organized as a limited liability entity. Public policy considerations also support applying the innocent insured doctrine here. Therefore I respectfully dissent.

¶ 48 The common law innocent insured doctrine applies when multiple insureds have an insurance policy and one of the insureds commits an act that would normally void the insurer's contractual obligations. See *Economy Fire & Casualty Co. v. Warren*, 71 Ill. App. 3d 625, 629 (1979). The doctrine operates to preserve insurance coverage if a reasonable person would not have understood that the wrongdoing of a coinsured would be imputed to him. *State Farm Fire & Casualty Insurance Co. v. Miceli*, 164 Ill. App. 3d 874, 881 (1987).

¶ 49 When determining if insurance coverage is appropriate, "this court can also consider a policyholder's reasonable expectations and the coverage intended by the insurance policy." *Cummins v. Country Mutual Insurance Co.*, 178 Ill. 2d 474, 485 (1997). Terpinas first purchased professional liability insurance from ISBA Mutual in 2005. He renewed the policy every year through 2008, when the misrepresentation was made on the renewal application. ISBA Mutual does not claim Terpinas was aware of Tuzzolino's actions, and it is undisputed that Terpinas informed ISBA Mutual of the potential claim on June 10, 2008, when he first became aware of it. Nothing in the policy explicitly stated each insured would face rescission of their professional liability coverage due to a misrepresentation by another member of the firm.

¶ 50 The policy coverage was uninterrupted until ISBA Mutual sought to rescind the contract. Without personal knowledge of Tuzzolino's misrepresentation, Terpinas had a reasonable expectation since 2005 that he was insured and that his policy would remain in effect. Nothing Terpinas did, or did not do, created a reasonable expectation that his insurance policy would be rescinded. Had ISBA Mutual intended to impute the wrongdoing of Tuzzolino onto Terpinas, it should have expressly stated so in the terms of the policy. See *Warren*, 71 Ill. App. 3d at 629. Accordingly, rescission is an equitable remedy left to the discretion of the court (*Springfield & Northeastern Traction Co. v. Warrick*, 249 Ill. 470, 476 (1911)), and here the equities do not favor rescission.

¶ 51 The policies underlying limited liability corporations are implicated in this case. Recognizing a public policy concern, this court adopted Illinois Supreme Court Rules 721 (Ill. S. Ct. R. 721 (eff. July 1, 2003)) and 722 (Ill. S. Ct. R. 722 (eff. Mar. 15, 2004)), requiring attorneys in limited liability entities to maintain at least a minimum level of professional liability insurance coverage or face joint and several liability. These rules were intended to protect consumers of legal services. Forming a limited liability entity benefits owners of a firm by restricting their personal liability as "determined by the provisions of the statute under which the limited liability entity is organized." Ill. S. Ct. R. 722(b) (eff. Mar. 15, 2004). In the absence of malpractice insurance, the public faces potential harm if malpractice occurs and the actor does not have sufficient assets to fulfill a judgment. Thus, the availability of malpractice coverage benefits both individual attorneys and their clients.

¶ 52 The reasoning in *First American Title Insurance Co. v. Lawson*, 827 A.2d 230 (N.J. 2003), is persuasive. In *Lawson*, a limited liability law firm had three partners. Two partners were involved in a kiting scheme, while the third was neither involved in nor aware of the scheme. *Lawson*, 827 A.2d at 233-35. The insurance carrier sought to void the malpractice coverage because the firm's application materially misrepresented its knowledge of any acts, errors, or omission in professional services that could have reasonably been expected to result in a professional liability claim. *Lawson*, 827 A.2d at 233-35. The court found that because the firm was organized as a limited liability partnership, the innocent partner had every reason to expect

- 10 -

his exposure to liability would be limited in accordance with applicable law. *Lawson*, 827 A.2d at 240. The court further found that by voiding the innocent partner's policy, he would no longer retain coverage for any act in unrelated matters, such as simple malpractice, during the period of expected coverage. *Lawson*, 827 A.2d at 240. The court held rescission was inappropriate as to the innocent partner, concluding "that harsh and sweeping result would be contrary to the public interest," and "it would be inconsistent with the policies underlying our Rules of Court that seek to protect consumers of legal services by requiring attorneys to maintain adequate insurance in this setting." *Lawson*, 827 A.2d at 240-41.

¶ 53    Similarly, because Terpinas's law firm was organized as a limited liability entity, he reasonably expected his liability to be limited within Rules 721 and 722 and reasonably relied on the professional liability insurance coverage provided by ISBA Mutual to limit his personal liability. When attorneys do not have professional liability insurance, the public faces an increased risk of harm as consumers of legal services. Rescission of Terpinas's professional liability insurance would expose his other clients unnecessarily under any form of malpractice. That result is inconsistent with the policies underlying Rules 721 and 722 that seek to protect consumers of legal services from financial harm.

¶ 54    In addition, I am troubled by the scope of the consequences resulting from the majority's holding on other law firms and especially midsize and large firms. Under the majority's view, a material misrepresentation on an insurance application could cause rescission of the policy as to each and every attorney, despite their reasonable expectations of continued professional liability insurance coverage. Furthermore, as the size of the affected firm increases, so does the potential harm to the public.

¶ 55    For these reasons, I respectfully dissent.