KHALID J. BAJWA, the Adm'r of the Estate of Muhammad Cheema, a/k/a Manwar Ahmand Bajwa, Deceased, Plaintiff-Appellant, v. METROPOLITAN LIFE INSURANCE COMPANY *et al.*, Defendants-Appellees.

First District (2nd Division)    No. 1—01—0844

Opinion filed August 13, 2002.—Rehearing denied September 23, 2002.

Corboy & Demetrio, of Chicago (David C. Wise, of counsel), for appellant.

Joseph J. Hasman and David F. Schmidt, both of Peterson & Ross, of Chicago, for appellee.

JUSTICE GORDON delivered the opinion of the court:

Plaintiff, Khalid J. Bajwa (plaintiff), administrator of the estate of Muhammad Cheema, brought a wrongful death action against Metropolitan Life Insurance Company (defendant or Met Life) alleging that Met Life's negligent issuance of an insurance policy on the life of Muhammad Cheema (decedent), designating Muhammad U. Cheema (Cheema) as the policy beneficiary, proximately caused the decedent's death. Plaintiff's fourth amended complaint, which is the subject of the instant appeal, contained four separate counts of

negligence against Met Life.[1] The trial court granted defendant's motion to dismiss counts IV through VI of plaintiff's complaint, and also granted defendant's motion for summary judgment on count VII.[2] Plaintiff now appeals the trial court's judgments. We affirm in part, reverse in part and remand.

## BACKGROUND

In December 1992, Cheema approached Imtiaz Sheik (Sheik), a Met Life account representative, and filled out an application for a life insurance policy on the life of the decedent. Cheema, whose name is nearly identical to the decedent's, represented himself as the decedent's son and provided Sheik with personal information about the decedent necessary for the policy application. Cheema also designated himself as the beneficiary of the policy and arranged for the policy premiums to be automatically deducted from his bank account, but listed the decedent as the "owner" of the policy on the application. Cheema then told Sheik that he would take the application to his "father" and obtain his "father's" signature, and Sheik agreed to this arrangement even though Met Life company procedure required that an insurance agent personally meet with the insured and witness the insured sign the policy application. Cheema returned the application to Sheik with a signature bearing the decedent's name. Although plaintiff asserts that Cheema forged the decedent's signature on the application, there is no evidence in the record which affirmatively refutes or supports this assertion. The record does, however, provide evidence which indicates that much of the information provided by Cheema on the policy application was incorrect. For example, the decedent's home address, occupation, years of employment, annual income, current insurance status and medical information were misstated. Further, the application wrongly indicated that Cheema was the decedent's son.

As part of the application process, the insured was required to submit to a medical examination conducted by EMSI, a paramedical company hired by Met Life. An individual who identified himself as the decedent was examined by EMSI in relation to the instant policy application. The individual, whom plaintiff now asserts was not the decedent, produced a State of Illinois identification card which identified him as the decedent. A Met Life investigator contacted the

---

[1]The complaint contained a total of seven counts. Counts I through III pertained to allegations of negligence against the other defendants in this case and are unrelated to the instant appeal.

[2]Plaintiff filed a cross-motion for summary judgment; however, no issues related to this motion have been raised on appeal.

Secretary of State's office and confirmed that an identification card was issued to an individual with the same name as the decedent. Notably, the individual examined by the EMSI paramedic was listed in the report as standing 5 feet 11 inches tall and weighing 195 pounds. At the time of his death, less than a year after the paramedical examination, the decedent stood 5 feet 8 inches tall and weighed 213 pounds.

The insurance application in question, including the parts containing the paramedical examiner's certification, were submitted to a Met Life underwriter prior to issuance of the policy. The underwriter noticed anomalies in the policy application which required further investigation. Specifically, the underwriter questioned why Cheema, rather than the insured's wife, was the policy beneficiary and why the beneficiary, rather than the insured, was paying the monthly policy premiums. The underwriter also questioned why the policy amount was $200,000 when the decedent's income, pursuant to Met Life financial guidelines, qualified him for a policy in the amount of $150,000. The underwriter confronted Sheik with these discrepancies and was told that the son was the beneficiary because the wife lived in Pakistan and foreign beneficiaries were discouraged by the company. Sheik also advised the underwriter that, despite information in the application suggesting otherwise, the insured would be paying the policy premiums with some assistance from his son. Sheik also explained that the increase in the policy amount was necessary because the decedent was supporting his wife and children in Pakistan and would be buried in Pakistan upon his death. Based on these explanations, the underwriter decided that the application was acceptable and issued the policy. The underwriter never asked Sheik if he personally met with the decedent. Notably, the policy application indicated, albeit dishonestly, that Sheikh had properly met with the decedent and certified the signing of the insurance application.

A policy insuring the life of the decedent in the amount of $200,000 was issued in January 1993. A note in the record indicates that, on February 19, 1993, an individual purporting to be the insured called Met Life four times with questions concerning potential coverage on possible death claims relating to the decedent's policy. Met Life's notations concerning these calls revealed that the caller asked whether the policy would pay if he was injured in a car accident in another country, returned to this country and then died. The caller was advised that an affirmative response could not be given because different factors would influence the decision to pay on the policy. Another notation indicated that a call was received wherein the caller asked "detailed questions about if he goes to Pakistan and dies will we [Met Life] pay the claim."

The notation further indicated that the caller "had specific hypothetical situations that he wanted to know if we would pay or not." The caller was given the number of the death claims division. Another call was received in which the caller asked whether Met Life would pay if he was in a car accident or his house was robbed and he was killed in Pakistan. Met Life responded by explaining the insurance contestability provision to the caller. During another call, the caller stated that he did not speak much English and put an individual on the phone whom he identified as his girlfriend. The policy conditions were then explained to the girlfriend.

A memorandum written to the vice president of the Mid-America head office who appears to have been involved in the investigation of the policy after the decedent's death refered to these calls and states:

> "Barb Gardener called. They received four calls on the case you inquired about. All of them came in on 2/19. They were strange enough that the case found its way into the Consulting Services area and they noted the file. They thought there'd be a disappearing act in Pakistan."

Six days after these calls were made to Met Life, the decedent was stabbed and beaten to death in his apartment. Cheema is the suspected murderer; however, he has never been convicted of this offense. The facts establish that he fled to Pakistan after the decedent's murder and has avoided extradition thus far.

Plaintiff filed his initial complaint in this matter in February 1995 and alleged that Met Life negligently issued an insurance policy on the life of the decedent. He subsequently filed first, second and third amended complaints, all of which were dismissed for insufficiency of the pleadings pursuant to defense motions filed under section 2—615 of the Code of Civil Procedure. 735 ILCS 5/2—615 (West 1994). Plaintiff then filed his fourth amended complaint. Count IV of the complaint alleged in relevant part that Met Life: (a) negligently and carelessly issued a life insurance policy on the life of the decedent without investigating the veracity of the information on the insurance application or personally meeting the insured; (b) issued a policy in favor of a beneficiary who did not possess an insurable interest in the life of the insured; (c) improperly relied on misrepresentations made by its agent in underwriting the policy; (d) failed to warn the decedent of suspicious phone calls which suggested that he was in imminent danger; and (e) provided a motivation and temptation for the murder of the decedent by the designated beneficiary. Count V alleged gross negligence for the same acts or omissions as they related to Met Life's agent, Sheik. Count VI alleged that Met Life negligently supervised Sheik. Count VII alleged that Met Life possessed actual knowledge of

the following information: (a) the decedent had no knowledge of the life insurance policy taken out on his life; (b) Cheema signed the application for the policy posing as the decedent; (c) Cheema was not related to the decedent and was specifically not the decedent's son; (d) an imposter took the physical examination required by the policy; (e) Cheema intended to murder the decedent to collect the policy benefits; and (f) Cheema did in fact murder the decedent after the policy was officially issued.

In a written order, the trial court granted defendant's section 2—615 motion to dismiss counts IV through VI of the fourth amended complaint on grounds of insufficient pleadings, stating that "[t]hese counts were previously dismissed by prior court order, and there are no new allegations contained in the Fourth Amended Complaint which would alter the court's prior dismissal." The trial court, however, denied defendant's motion to dismiss count VII of the complaint because plaintiff pled actual knowledge on the part of Met Life. Defendant subsequently filed a motion for summary judgment on count VII, and the trial court granted the motion, reasoning that "[t]he facts, as presented by both parties in the cross-motions, fail to support these allegations [of actual knowledge], or to establish an issue of fact as between these parties."

Plaintiff now appeals the trial court's dismissal of counts IV through VI of his complaint and the summary judgment order related to count VII. Plaintiff asserts that the pleadings were sufficient to state a cause of action against defendant and that a question of fact exists as to whether Met Life breached its duty of reasonable care when it issued an insurance policy in favor of a beneficiary with no insurable interest on the life of the insured, failed to verify that the insured was aware of and consented to the policy, failed to investigate discrepancies and errors in the life insurance application and failed to warn the insured of suspicious phone calls regarding the payout of policy benefits.

## ANALYSIS

■ To state a cause of action for negligence, a plaintiff must allege facts in his complaint which establish that defendant owed plaintiff a duty, that defendant breached that duty and that plaintiff sustained an injury as a result of the breach. *Doe v. Calumet City*, 161 Ill. 2d 374, 384, 641 N.E.2d 498, 503 (1994). Whether a sufficient duty exists to support a negligence claim is a question of law properly subject to *de novo* review by this court. *Colombo v. Wal-Mart Stores, Inc.*, 303 Ill. App. 3d 932, 933-34, 709 N.E.2d 301, 302 (1999).

The primary issue presented by this case is whether an insurer

could ever be held liable for the murder of the insured, under a theory of negligence, where the policy sold provided the incentive to the beneficiary to kill the insured. The parties agree that this is an issue of first impression in Illinois. However, similar causes of action have been raised in other states, and because Illinois is devoid of statutes or case law in this area, we look to the decisions of several other state courts for guidance.

At the outset, we note that state courts have increasingly recognized wrongful death claims resulting from the negligent issuance of life insurance policies. See, *e.g.*, *Life Insurance as Motive for Murder*, 29 Tort & Ins. L.J. 761 (1994). Several state courts have formally recognized that such actions may proceed under the common law of negligence. See *Liberty National Life Insurance Co. v. Weldon*, 267 Ala. 171, 100 So. 2d 696 (1957); *Life Insurance Co. v. Lopez*, 443 So. 2d 947 (Fla. 1983); *Ramey v. Carolina Life Insurance Co.*, 244 S.C. 16, 135 S.E.2d 362 (1964); *Williams v. John Hancock Mutual Life Insurance Co.*, 718 S.W.2d 611 (Mo. 1986); see, *e.g.*, *Insurer's Tort Liability for Wrongful or Negligent Issuance of Life Policy*, 37 A.L.R.4th 972 (1985). We also note that the parties have not indicated that any states have prohibited recovery or have rejected any duty by the insurer in actions of this type. Accordingly, we are not inclined to reject out of hand the recognition of a duty by the insurer to use reasonable care so as not to provide an incentive to murder through the issuance of its life insurance policies.

■ The case law of other jurisdictions has recognized the validity of such claims on three different grounds which may lead to carrier liability for wrongful death in the event that the murder of the insured is committed by someone who receives the benefits of a life insurance policy. The first is where the insurance company should have known that the individual who procured and owned the policy, and named herself as the beneficiary, had no insurable interest in the life of the insured. See *Weldon*, 267 Ala. 171, 100 So. 2d 696. The second is where the insurance company had knowledge that the insured was unaware of and did not consent to the policy. See *Ramey*, 244 S.C. 16, 135 S.E.2d 362; *Williams*, 718 S.W.2d 611. The third factual predicate is where the insurance company had actual knowledge of the beneficiary's intent to murder the insured and failed to take action. *Lopez*, 443 So. 2d 947. Liability has also been supported by the cumulative impact of more than one of these factual predicates. See, *e.g.*, *Ramey*, 244 S.C. 16, 135 S.E.2d 362. In our case, the plaintiff's complaint alleges that each of these factual predicates was present and that each, in itself, as well as cumulatively, is sufficient to form a basis for insurer liability. Plaintiff contends that each of these grounds was sufficiently pled in

his complaint and must, for the purposes of a section 2—615 pleadings motion, be held to exist in this case.[3] We therefore address the sufficiency of each of these grounds in turn.

## Insurable Interest

First, plaintiff contends that counts IV through VI of his complaint sufficiently pled facts establishing that Met Life owed a duty of reasonable care "not to issue a policy of life insurance in favor of a beneficiary who has no interest in the continuation of the life of the insured." For this proposition, plaintiff relies on the leading and often-cited Alabama case of *Liberty National Life Insurance Co. v. Weldon*. In *Weldon*, an aunt-in-law obtained several life insurance policies on her 2½-year-old niece and then poisoned the child in order to collect the insurance proceeds. The aunt-in-law was convicted of the child's murder. The child's father filed suit against the insurance companies arguing that they knew or should have known that the aunt-in-law had no insurable interest in the life of the child, that they failed to exercise "reasonable diligence" to ascertain whether an insurable interest existed even though they had a duty to do so and that their failure to perform that duty proximately caused the child's death. *Weldon*, 267 Ala. at 182, 100 So. 2d at 704.

In *Weldon*, the aunt-in-law procured the policies on her niece's life, paid the policies' premiums and named herself the beneficiary of each policy; however, she did not have an insurable interest in the life of her niece under Alabama law and, thus, was not considered an appropriate beneficiary. The insurance companies that issued the policies were well aware that the child did not live with the aunt-in-law, that the aunt-in-law did not support the child and that the child lived with her parents. Despite this knowledge, none of the insurance companies required that the child's parents sign the insurance application on the

---

[3]In count IV of his complaint, plaintiff alleges that Met Life knew or should have known that "issuance of a life insurance policy without investigating whether the designated beneficiary had an insurable interest in the life of the insured would create a motivation and temptation for the murder of the insured by the beneficiary." Plaintiff further alleged in count IV that defendant "completed the life insurance application without propounding any questions personally of the insured and without ever having personally seen the insured." Likewise, in count VII, plaintiff alleged that "the insured *** had no knowledge that Met Life had agreed to issue, and had in fact issued, a policy of life insurance *** on his life." Also in count VII, plaintiff alleged that defendant had actual knowledge that the beneficiary under the policy "intended to murder the named insured as soon as the policy was issued in order to collect the policy benefits."

child's life. Further, the child's parents were never made aware of the policies issued on their daughter's life until after her death. *Weldon*, 267 Ala. at 183-85, 100 So. 2d at 705-07.

The Alabama Supreme Court considered the issue of the insurance companies' duty as a matter of first impression and held:

> "It has long been recognized by this court and practically all courts in this country that an insured is placed in a position of extreme danger where a policy of insurance is issued on his life in favor of a beneficiary who has no insurable interest. *** Where this court has found that such policies are unreasonably dangerous to the insured because of the risk of murder and for this reason has declared such policies void, it would be an anomaly to hold that insurance companies have no duty to use reasonable care not to create a situation which may prove to be a stimulus for murder."
> *Weldon*, 267 Ala. at 186, 100 So. 2d at 708.

The *Weldon* court explained the basis for its finding of such duty stating, "we are of the opinion that such a duty exists, for there is a duty upon all to exercise reasonable care not to injure another." *Weldon*, 267 Ala. at 185, 100 So. 2d at 708.

■ Illinois law is consistent with the underlying premise in *Weldon*, that a life insurance policy must not be sold to or be procured by an individual who has no insurable interest in the life of the insured. Illinois law has long required that the procurer of an insurance policy on the life of another must have an insurable interest in the other's life. *Guardian Mutual Life Insurance Co. of New York v. Hogan*, 80 Ill. 35, 39 (1875) (in cases where one procures insurance on the life of another, "the plaintiff must aver *** that he had an insurable interest in the life of the insured, and prove the same affirmatively"); *Hawley v. Aetna Life Insurance Co.*, 291 Ill. 28, 30, 125 N.E. 707, 708 (1919) ("courts have uniformly held that one having no insurable interest in the life of another cannot procure a policy of insurance on such life, and the policy so procured is void at its inception"). This requirement is grounded in public policy, which forbids a person with no interest in the continuation of a life to obtain insurance on that life. *Colgrove v. Lowe*, 343 Ill. 360, 363, 175 N.E. 569, 571 (1931) ("[p]ublic policy forbids one person who has no interest in the continuance of the life of another from speculating on that life by procuring a policy of insurance"); *Bowman v. Zenith Life Insurance Co.*, 67 Ill. App. 3d 393, 394, 384 N.E.2d 949, 950 (1978). As the United States Supreme Court stated in *Grigsby v. Russell*, 222 U.S. 149, 154-55, 56 L. Ed. 133, 136, 32 S. Ct. 58, 58 (1911):

> "A contract of insurance upon a life in which the insured has no interest is a pure wager that gives the insured a sinister counter

interest in having the life come to an end. And although that counter interest always exists, *** the chance that in some cases it may prove a sufficient motive for crime is greatly enhanced if the whole world of the unscrupulous are free to bet on what life they choose."

■ However, while it has long been the established law of Illinois that the purchaser of an insurance policy must have an insurable interest in the insured's life (*Hogan*, 80 Ill. at 39), it has also long been held that "one may insure his own life for the benefit of another having no insurable interest therein" (*Colgrove*, 343 Ill. at 363, 175 N.E. at 571). Illinois makes a distinction between the requirement that the procurer of the policy have an insurable interest and the requirement that the beneficiary have an insurable interest. See *Hawley*, 291 Ill. at 30, 125 N.E. at 708 ("courts have uniformly held that one having no insurable interest in the life of another cannot procure a policy of insurance on such life ***. This court has also held that one may insure his own life for the benefit of another having no insurable interest therein"). As Couch on Insurance explains, although a person generally cannot procure a life insurance policy for his own benefit on the life of a person in which he has no insurable interest, it is proper for an individual to procure a life insurance policy on his own life and designate whomever he or she chooses as a beneficiary, even if the beneficiary possesses no insurable interest, provided that there exists no statute or controlling regulation to the contrary in the state where the policy is procured. 5 Couch on Insurance 3d § 108 (rev. 1997).

Thus, although Illinois law clearly states that an individual must have an insurable interest in the life of another to obtain an insurance policy on that life (*Hogan*, 80 Ill. at 39), there is no provision in Illinois law which states that insurance companies have a duty to refrain from issuing life insurance policies to the person whose life is being insured, who may then designate a beneficiary without an insurable interest. *Colgrove*, 343 Ill. at 363, 175 N.E. at 571. In other words, the requirement of having an insurable interest is imposed only with respect to the procurer of the policy, not the ultimate beneficiary.

■ With these propositions in mind, we consider whether counts IV through VI of plaintiff's complaint are sufficient to state a cause of action in negligence for issuing a life insurance policy to a beneficiary with no insurable interest on the life of the insured. In doing so, we are mindful that a section 2—615 motion attacks the legal sufficiency of a complaint and should be granted only in those situations where the allegations of the complaint, viewed in a light most favorable to the plaintiff, are insufficient to state a cause of action upon which relief can be granted. *La Salle National Bank v. City Suites, Inc.*, 325

Ill. App. 3d 780, 790, 758 N.E.2d 382, 390 (2001). In considering the trial court's judgment, this court accepts all well-pled facts and the reasonable inferences to be drawn therefrom as true. *Bryson v. News America Publications, Inc.*, 174 Ill. 2d 77, 86-87, 672 N.E.2d 1207, 1214 (1996). A cause of action will not be dismissed on the pleadings unless it is apparent that no set of facts could be proved which will entitle the plaintiff to recover. *Bryson*, 174 Ill. 2d at 86-87, 672 N.E.2d at 1213-14.

Plaintiff first urges that defendant's liability under counts IV through VI of the complaint are sustainable by reason of the fact that the beneficiary designated by the policy did not have an insurable interest in the life of the decedent. The allegations pertaining to the issue of insurable interest in counts IV through VI of plaintiff's complaint allege:

"50. That the Defendant Met Life negligently and carelessly failed to investigate the material and crucial facts of whether the designated beneficiary had an insurable interest in the life of the insured before issuing the life insurance policy on the life of the Decedent.

51. That Met Life and its agents and employees negligently and carelessly designated the beneficiary who had no insurable interest in the life of the decedent. That the named beneficiary, the accused murderer, paid insurance premiums by his personal check and signed an agreement with Metropolitan Insurance agency to pay future premiums from his bank account through a Check-O-Matic arrangement, thereby guaranteeing payments of future premiums.

\* \* \*

60. That Met Life and its employees and agent knew or should have known that issuance of the life insurance policy without investigating whether the designated beneficiary had an insurable interest in the life of the insured would create a motivation and temptation for the murder of the insured by the beneficiary."

■ With respect to counts IV through VI of his complaint, plaintiff raises several other theories of recovery that shall be separately discussed herein. However, we find that the allegations set forth above, as they relate to the issue of insurable interest, are insufficient. These allegations fail to recognize the distinction under Illinois law between an individual who procures a policy on the life of another without an insurable interest and an individual without an insurable interest who is named as the policy beneficiary by the insured. Plaintiff purports to extend the duty of the insurance company beyond the parameters of the insurable interest doctrine as applied in Illinois. As is apparent from a review of these pleadings, plaintiff did not allege that Met Life

issued an insurance policy on the life of the decedent *to* an individual who did not possess an insurable interest but, rather, that Met Life allowed the policy owner to designate a beneficiary who did not possess an insurable interest. Thus, as pled, these allegations would seek to impose liability even if, under the facts of this case, the policy was procured by the decedent himself or his agent on his behalf, so long as the beneficiary lacked an insurable interest in the continuation of the decedent's life. These allegations fail to establish a violation under Illinois law of the insurable interest requirement. As a.result, the allegations raised by plaintiff in the complaint, viewed in the light most favorable to the plaintiff, are insufficient to establish a cause of action.

Thus, with respect to this issue, we agree with the trial court. We do so without having to determine at this time whether a duty would exist if the pleadings sufficiently alleged, in comportment with Illinois law, that the procurer of the policy on the life of the decedent did not have an insurable interest in that life. As shall be more fully discussed below, this conclusion should by no means be interpreted as a disagreement with the general proposition in the *Weldon* opinion that insurance companies have a duty "to use reasonable care not to create a situation which may prove to be a stimulus for murder." *Weldon*, 267 Ala. at 186, 100 So. 2d at 708. Nor should this be construed as a disagreement with the proposition in *Weldon* which would impose liability upon the insurer, under a negligence theory, where the insurer permits procurement of a policy in violation of the insurable interest requirement under state law in the event that such violation becomes the proximate cause of the insured's murder. *Weldon*, 267 Ala. at 186, 100 So. 2d at 708.

### Duty to Advise Insured of Policy on His Life

Turning to the second ground upon which plaintiff next seeks to predicate the insurer's liability, this court is called upon to determine whether Met Life had a duty to ensure that the decedent was aware that a policy insuring his life had been procured on his behalf by Cheema.

With respect to this duty, the complaint at counts IV through VI avers in relevant part:

> "47. That it was the duty of Met Life, its agents, servants and employees and each of the other aforesaid defendants, their agents, servants and employees to exercise due care and caution in the preparation and completion of the life insurance application to insure the life of the decedent.
> * * *
> 49. That Defendant Met Life failed to properly supervise its

agent, Defendant IMTIAZ SHEIK, who had breached the standard procedural rules for completing a life insurance application to insure the life of the Decedent. The Defendant insurance agent, IMTIAZ SHEIK, completed the life insurance application without propounding any questions personally to the insured and without ever having personally seen the insured and falsely stated that he had seen the insured and asked questions from the insured and recorded his answers.

\* \* \*

53. That Met Life negligently and carelessly failed to investigate crucial material facts before the issuance of the life insurance policy and negligently and carelessly relied on the material misrepresentations made by its insurance agent and employees in the life insurance application.

54. That the negligent and careless issuance of the life insurance policy insuring the life of the decedent is cause-in-fact and a proximate cause for the murder of the insured."

In raising these allegations, plaintiff urges this court to recognize that insurers have a duty to ascertain, prior to their issuance of a policy on the life of another, whether the individual named as the insured is aware of and has consented to the procurement of a policy on his life. While this is an issue of first impression in this state, such a duty has been recognized by courts in other jurisdictions.

The leading South Carolina case of *Ramey v. Carolina Life Insurance Co.* is on point and persuasive. There, a wife obtained a life insurance policy on the life of her husband without his consent, forged his signature on the policy application, and named herself the beneficiary of the policy. She then attempted to murder her husband by poisoning him. According to the facts of the case, the insurance company knew that the husband was unaware of the policy and that the wife had forged his signature. The husband filed suit against the insurance company for the injuries he sustained alleging that the insurance company's negligent issuance of a policy on his life induced his wife to attempt to murder him for the proceeds. The South Carolina Supreme Court recognized that a wife generally has an insurable interest on the life of her husband, but nevertheless concluded that, even with the existence of an insurable interest, insurance taken out on the life of another, without consent, is against public policy and void. *Ramey*, 244 S.C. at 21, 135 S.E.2d at 364. The court went on to hold that "an insurance company has a duty to use reasonable care not to issue a policy of life insurance in favor of a beneficiary who has obtained such policy without the knowledge or consent of the insured, and this would especially be true, where as here, the company knew or

had reason to know that such was the situation." *Ramey*, 244 S.C. at 25, 135 S.E.2d at 366.

In reaching this conclusion, the *Ramey* court relied on and quoted *Hack v. Metz*, 173 S.C. 413, 418, 176 S.E. 314, 316 (1934), which stated that " '[i]t has been broadly stated that insurance taken out on the life of another, without the latter's consent is against public policy and void.' " *Ramey*, 244 S.C. at 22, 135 S.E.2d at 365. It further relied on and quoted *Holloman v. Life Insurance Co. of Virginia*, 192 S.C. 454, 457, 7 S.E.2d 169, 170-71 (1940), where the court stated that " 'the authorities generally are to the effect that except in the case of an infant a policy of life insurance taken out without the knowledge or consent of the insured person is not enforceable.' " *Ramey*, 244 S.C. at 22, 135 S.E.2d at 365. The *Ramey* court also added that " '[i]t is a general rule that a policy of life insurance taken out without the knowledge or consent of the insured person is against public policy and unenforceable. *** [S]uch a practice, it has been deemed, might be a fruitful source of crime.' " *Ramey*, 244 S.C. at 22, 135 S.E.2d at 365, quoting 29 Am. Jur. *Insurance* § 231, at 617. The *Ramey* court then noted that the reasoning of the Alabama Supreme Court in *Weldon* was "pertinent" in finding a duty on the part of an insurance carrier not to issue a policy without the insured's knowledge or consent. In doing so, the *Ramey* court highlighted *Weldon*'s reasoning that a duty exists because " 'there is a duty upon all to exercise reasonable care not to injure another.' " *Ramey*, 244 S.C. at 25, 135 S.E.2d at 366, quoting *Weldon*, 267 Ala. at 185, 100 So. 2d at 708. The *Ramey* court summarized its position on the issue of duty stating:

> "I am of the opinion that an insurance company has a duty to use reasonable care not to issue a policy of life insurance in favor of a beneficiary who has obtained such policy without the knowledge or consent of the insured ***. The rule against issuing policies on the life of a person without his knowledge or consent is 'designed to protect human life.' Policies issued in violation of this rule are 'not dangerous because they are illegal; they are illegal because they are dangerous.' " *Ramey*, 244 S.C. at 25, 135 S.E.2d at 366-67, quoting *Weldon*, 267 Ala. at 186, 100 So. 2d at 708.

Similarly, in *Williams v. John Hancock Mutual Life Insurance Co.*, the Missouri Court of Appeals considered a case where the plaintiff alleged that he was shot and partially paralyzed due to the defendant insurance company's negligent issuance of a policy on his life. In *Williams*, Angela Franks, an agent for the defendant insurance company, who was acquainted with the plaintiff through other business dealings, submitted an application to the insurer on the life of the plaintiff without the plaintiff's knowledge or consent. Although the policy ap-

plication was purported to be signed by the plaintiff, his testimony indicated that he never signed the forms, and a handwriting expert corroborated this testimony opining that the signatures were forged. *Williams*, 718 S.W.2d at 612. Notably, the defendant's internal protocol required that an insurance agent witness the signing of an insurance application. *Williams*, 718 S.W.2d at 613. The named beneficiary on the policy was originally the plaintiff's wife, but was later changed to name Caroline Hinton, a friend of both the plaintiff and Franks, as the beneficiary. The insurance company did not contact the plaintiff when this change-of-beneficiary occurred.

Less than four years after the policy was issued, the plaintiff was shot in the back and partially paralyzed. It was the plaintiff's theory that Franks, Hinton and two other individuals involved in his shooting conspired to kill him to obtain the insurance benefits of the policy issued by the defendant. The plaintiff thus filed a negligence action against the defendant for issuing the policy. In considering whether the defendant was negligent, the Missouri court held:

> "The negligent issuance of a life insurance policy is unlikely to lead to an attempt on the insured's life. However, murder is such a serious crime that it is against public policy not to discourage any act which even marginally increases the risk that murder will be attempted. We therefore refuse to hold that an insurance company has no liability if it negligently issues an insurance policy which acts as an incentive for murder or attempted murder. The increased risk caused by the negligent issuance of life insurance may be slight, but it is certainly foreseeable." *Williams*, 718 S.W.2d at 613.

In addition to the holdings in *Ramey* and *Williams*, the duty of an insurance company to determine whether an insured is aware of and has consented to the issuance of a policy on his life was recognized by the Massachusetts Supreme Court in *Bacon v. Federal Kemper Life Assurance Co.*, 400 Mass. 850, 512 N.E.2d 941 (1987). There, the facts showed that the decedent's business partner forged the decedent's name on a change of beneficiary application, named himself the beneficiary and then murdered the decedent for the policy proceeds. The decedent's wife filed a wrongful death negligence action against the insurance company alleging that the insurer breached its duty of care to the decedent when effectuating the change of beneficiary request. The *Bacon* court found that there was enough evidence to show that the insurer owed a duty to the decedent, although the evidence was insufficient to establish a breach of that duty. *Bacon*, 400 Mass. at 854, 512 N.E.2d at 943. In reaching its conclusion that a duty existed, the *Bacon* court specifically recognized that "[t]he only duty that the law imposes on an insurance company to protect its insured

is that the company take reasonable steps to determine whether the insured has consented to the policy or the change of beneficiary." *Bacon*, 400 Mass. at 855, 512 N.E.2d at 944.

Additionally, we note that the duty to advise the insured of a policy, while not a primary issue, was also mentioned in the *Weldon* case. While the Alabama Supreme Court did not consider the issue of whether an insurer has a duty to determine knowledge and consent on the part of the insured, or in the case of a minor, the insured's parents, it nevertheless specifically noted that the defendant insurance companies that issued policies to the aunt-in-law for the minor child did so without the knowledge and consent of the child's parents. *Weldon*, 267 Ala. at 184-85, 100 So. 2d at 706-07. This factor contributed to the *Weldon* court's conclusion that "none of the insurance companies were concerned about the matter of insurable interest and did not undertake to exercise reasonable care not to issue a policy to a beneficiary without [an] insurable interest." *Weldon*, 267 Ala. at 185, 100 So. 2d at 707. We further note that *Weldon* was cited with approval in the Illinois case of *Orrico v. Beverly Bank*, 109 Ill. App. 3d 102, 440 N.E.2d 253 (1982), which will be discussed more fully below.

■ We too are inclined to find that a duty exists on the part of an insurance carrier to ascertain whether the insured is aware of and has consented to the policy. Whether a duty exists is contingent upon several factors, and the weight accorded to each factor depends upon the specific circumstances of each case. *Kotarba v. Jamrozik*, 283 Ill. App. 3d 595, 597, 669 N.E.2d 1185, 1187 (1996). In determining whether a duty exists, this court must consider: (1) the reasonable foreseeability of injury; (2) the likelihood of injury; (3) the magnitude of the burden of guarding against the injury; and (4) the consequences of placing that burden on the defendant. *Jones v. Chicago HMO Ltd. of Illinois*, 191 Ill. 2d 278, 303, 730 N.E.2d 1119, 1134 (2000). Significantly, the existence of a duty is largely based on public policy considerations. *Jones*, 191 Ill. 2d at 303, 730 N.E.2d at 1134. We will consider each of these factors in turn.

With respect to the foreseeability of injury to the decedent in this case, we conclude that the injury was reasonably foreseeable. It is widely recognized in Illinois, as in other jurisdictions, that the issuance of a life insurance policy to someone with no interest in the life of the insured *"is a pure wager"* that creates *"a sinister counter interest in having the life come to an end."* (Emphasis added.) *Grigsby*, 222 U.S. at 154, 56 L. Ed. at 136, 32 S. Ct. at 58 (cited in *Colgrove*, 343 Ill. at 363, 175 N.E.2d at 571, and quoted in *Gray v. North American Mutual Union*, 249 Ill. App. 74, 84 (1928), *Hawley*, 291 Ill. at 32, 125 N.E. at 707, and *Zenith*, 67 Ill. App. 3d at 394, 384 N.E.2d at 949); ac-

cord *Weldon*, 267 Ala. at 186, 100 So. 2d at 708 ("it has long been recognized by this court and practically all courts in this country that an insured is placed in a position of extreme danger where a policy of insurance is issued on his life in favor of a beneficiary who has no insurable interest"). Met Life clearly recognized the danger in issuing policies of this nature as evidenced by the fact that its own internal procedures required its insurance agents to meet with the insured and certify his signing of the insurance application, presumably for the purpose of guarding against the procurement of "wager" policies on the life of another and the injuries that would follow as a result. Furthermore, the foreseeability of injury in the event that a policy is procured by someone without an interest in the continuation of the insured's life is inherent in the very nature of life insurance policies because the insured must die in order for the beneficiary to collect.

■ Under Illinois law, the fact that the injury occurs through the intervening act of a third party is not, by itself, sufficient to break the causal relationship or otherwise render the injury unforeseeable. This issue was cogently considered in *Orrico v. Beverly Bank*, 109 Ill. App. 3d 102, 440 N.E.2d 253 (1982). There, we determined that the bank owed a duty to the decedent, an incompetent, "not to utilize his funds in a manner which would increase the risk of danger to him." *Orrico*, 109 Ill. App. 3d at 106, 440 N.E.2d at 256. We further concluded that the risk of harm to the decedent was foreseeable where the decedent was murdered after the bank allowed him to withdraw a large sum of cash even though the decedent's mother, who was given the right to conduct the decedent's financial affairs pursuant to a court order of which the bank was aware, demanded that the bank deny the decedent's request to withdraw. *Orrico*, 109 Ill. App. 3d at 104-05, 440 N.E.2d at 255-56. In considering whether the intervening criminal act of a third party was sufficient to insulate the bank from liability, the court held that it was sufficiently foreseeable that an incompetent carrying a large sum of money could be robbed upon leaving a bank so as to permit imposition of liability on the defendant bank. *Orrico*, 109 Ill. App. 3d at 107, 440 N.E.2d at 257. We note that, in reaching this conclusion, the *Orrico* court relied on several cases and, as noted above, also cited approvingly to the *Weldon* decision previously discussed. *Orrico*, 109 Ill. App. 3d at 107, 440 N.E.2d at 257.

The decision in *Orrico* is consistent with, and in fact relied upon, the supreme court cases of *Neering v. Illinois Central R.R. Co.*, 383 Ill. 366 (1943), and *Ney v. Yellow Cab Co.*, 2 Ill. 2d 74, 81, 117 N.E.2d 74 (1954). In *Neering*, our supreme court considered whether a railroad could be held liable in negligence for the assault of a passenger on the train platform when the railroad was aware of dangerous conditions at

the train station. The defendant railroad contended that it was relieved of liability through the criminal acts of a third party, namely, the individual who committed the assault. The *Neering* court explained that "[t]he intervening act of a third person does not necessarily relieve the author of an earlier negligent or wrongful act from responsibility when the intervening cause of an injury is of such nature as could reasonably have been anticipated." *Neering*, 383 Ill. at 381, 50 N.E.2d at 504. The court concluded that there was sufficient evidence tending to establish that the defendant railroad could have "reasonably anticipated" and "provided against" the assault against the plaintiff and reversed the trial court's judgment notwithstanding the verdict in favor of the defendant. *Neering*, 383 Ill. at 382, 50 N.E.2d at 504.

Similarly, in *Ney*, our supreme court considered whether the intervening criminal act of a third party relieved the defendant of negligence where an employee of the defendant left a taxi cab unlocked and running on a street, the cab was stolen, and the thief, while in flight, struck and damaged the plaintiff's car. The *Ney* court stated that "[t]he intervention of a criminal act *** does not necessarily interrupt the relation of cause and effect between negligence and an injury. If at the time of the negligence, the criminal act might reasonably have been foreseen, the causal chain is not broken by the intervention of such act." *Ney*, 2 Ill. 2d at 80. The court then concluded that reasonable men could differ as to whether the intervening act was foreseeable, and thus, there was no "impelling reasoning" for the court to hold as a matter of law that no cause of action in negligence existed against the defendant. *Ney*, 2 Ill. 2d at 84.

In this case, as in *Orrico, Neering* and *Ney*, we cannot hold that it was unforeseeable that the decedent could suffer an injury at the hands of a third party where a life insurance policy was issued, without verification of the decedent's knowledge or consent, naming an individual with no interest in the continuation of the decedent's life as the beneficiary. The insurer could have reasonably anticipated that the issuance of a policy under these circumstances could " 'in some cases *** prove a sufficient motive for crime [that] is greatly enhanced if the whole world of the unscrupulous are free to bet on what life they choose.' " *Gray v. North America Mutual Union*, 249 Ill. App. 74, 84 (1928), quoting *Grigsby*, 222 U.S. at 154, 56 L. Ed. at 136, 32 S. Ct. at 58; accord *Weldon*, 267 Ala. at 183, 100 So. 2d at 705; *Ramey*, 244 S.C. at 24, 135 S.E.2d at 366-67; *Williams*, 718 S.W.2d at 613.

For the same reasons we concluded that a reasonable foreseeability of injury existed in this case, we also conclude that there is a sufficient likelihood of injury. As discussed above, our own courts have

recognized such a likelihood, as have the courts of other jurisdictions as the cases cited herein demonstrate. See *Hogan*, 80 Ill. at 44-45, quoting *Ruse v. Mutual Benefit Life Insurance Co.*, 23 N.Y. 516, 526 (1861) (" 'policies without interest, upon lives, are more pernicious and dangerous than any other class of wager policies' "); *Colgrove*, 343 Ill. at 363, 175 N.E.2d at 571 ("[p]ublic policy has universally found expression in judicial decisions refusing to allow life insurance to be taken out in the first instance by persons having no interest in the life of the insured. \*\*\* [A] contract of insurance upon a life in which the insurer has no interest \*\*\* gives the insurer a sinister counter-interest in having the life come to an end"); *Weldon*, 267 Ala. at 186, 100 So. 2d at 708 ("[p]olicies in violation of the insurable interest rule are not dangerous because they are illegal; they are illegal because they are dangerous"); *Ramey*, 244 S.C. at 22, 135 S.E.2d at 365 ("[t]he law thus seems to be well recognized in this State that a policy of insurance taken out on the life of another without his knowledge or consent is void and against public policy in that it might be a fruitful source of crime"); *Williams*, 718 S.W.2d at 613 ("murder is such a serious crime that it is against public policy not to discourage any act which even marginally increases that risk that murder will be attempted"). As previously noted, the potential for injury is also recognized when an insurance policy is issued without the knowledge and consent of an insured because a beneficiary of a life insurance policy cannot collect the proceeds unless the insured party is deceased. See *Ramey*, 244 S.C. at 24, 135 S.E.2d at 366-67 ("[t]he rule against issuing policies on the life of a person without his knowledge or consent is 'designed to protect human life.' Policies issued in violation of this rule are 'not dangerous because they are illegal; they are illegal because they are dangerous' "), quoting *Weldon*, 267 Ala. at 186, 100 So. 2d at 708.

The risk of injury to an insured could readily be reduced if insurance companies were required to make reasonable efforts to ensure that the insured party is aware of any policy issued upon his life. Apparently, such a requirement would not be overly burdensome to insurance companies, which, judging by the record in this case, have already implemented internal protocols that are designed to provide for such safeguards. See, *e.g.*, *Williams*, 718 S.W.2d at 613 ("respondent [defendant] did not investigate whether or not Caroline Bailey Hinton had an insurable interest in the appellant's life and there was evidence that respondent [defendant] failed to make any direct contacts with appellant [plaintiff]. There was also testimony that the agent was required to witness the insured's signing of applications for insurance"). As the facts alleged here demonstrate, the insurer in this case

was required to meet with the prospective insured and certify his signing of the insurance application before submitting it to the underwriter who would, in turn, investigate any discrepancies or abnormalities in the application. These factors suggest that there is a duty upon an insurer to determine whether an insured is aware of a policy procured upon his life. The recognition of such a duty would be consistent with general negligence principles and would implement the recognized public policy of this state to preclude sales of insurance that would unnecessarily endanger the life of the insured. See *Hogan*, 80 Ill. at 44-45; *Colgrove*, 343 Ill. at 363, 175 N.E.2d at 571. For these reasons, we conclude that an insurer may not, with impunity, provide coverage on someone's life without undertaking reasonable precautions to ascertain whether the insured is aware of and has consented to the issuance of the policy.

In reaching this conclusion, we have considered defendant's contention that Met Life did not possess any actual knowledge of Cheema's murderous plot and, therefore, cannot be held liable. In making this argument, defendant relies on the *Ramey* court's statement that an insurance company has a duty not to issue a life insurance policy in favor of a beneficiary without the knowledge and consent of the insured, "and this would especially be true, where as here, the company knew or had reason to know that such was the situation." *Ramey*, 244 S.C. at 25, 135 S.E.2d at 366. Defendant, however, mischaracterizes the *Ramey* holding. Contrary to defendant's contention, the *Ramey* court did not state that actual knowledge was required for a duty to exist but, rather, that the duty was heightened by actual knowledge on the part of the insurance company.

We acknowledge that, in *Ramey*, the insurance company was aware that the policy was procured by the beneficiary and not by the insured, whereas here, the facts alleged by the parties suggest that Met Life was under the impression that Cheema was procuring the policy on his alleged father's behalf. However, the facts in this case as pled alleged that the decedent did not, in fact, consent to the policy and that he was not the father of Cheema. For the purposes of a section 2—615 motion, these facts must be taken as true. See *Bryson*, 174 Ill. 2d at 86-87, 672 N.E.2d at 1214. As previously noted, these facts could have been ascertained by the insurance company if it had followed its own internal procedures, which required the agent to meet personally with the decedent to verify his identity and to certify the decedent's signing of the insurance application. The insurer's negligence in failing to verify the decedent's consent was further exacerbated by facts showing that the beneficiary was paying the policy premiums, the policy was written in excess of the amount generally allowed for a person in

the decedent's income bracket and the named beneficiary was the decedent's alleged son, instead of his wife. Furthermore, a follow-up by the insurer would have revealed that Cheema's application misstated the decedent's address, occupation, employment history, salary and medical information. Moreover, subsequent telephone inquiries as to whether there would be entitlement to life insurance proceeds in the event of the decedent's accidental death or murder reasonably could have heightened the suspicions of the insurer so as to place upon it the burden of further inquiry to ascertain Cheema's veracity in his application as to his alleged father-son relationship with the decedent, and as to the decedent's consent to the issuance of the policy.

The trial court concluded that these facts were nevertheless insufficient to state a cause of action in negligence because plaintiff failed to allege that Met Life had actual knowledge of Cheema's murderous plans. In point of fact, there is no basis in the underlying theory of recovery to arbitrarily impose a requirement of actual knowledge as a predicate for the insurer's liability. Whether based upon actual knowledge or whether the insurer is held to a reasonable duty of inquiry, its liability would still be predicated upon a negligence theory. In no event would actual knowledge of the insurer as to the consent of the insured transform the action into one for an intentional tort since even with such knowledge, the insurer's liability would be grounded in negligence and by no means would be tantamount to intentionally causing the insured's death which occurred as a result of his murder by an intervening third party. See generally *Ziarko v. Soo Line R.R. Co.*, 161 Ill. 2d 267, 272-74 (1994) (discussing the differences between simple negligence, willful and wanton conduct and intentional tort). Nor has the insurer provided any basis that would permit this court to limit the liability of the insurer to willful negligence alone. Such actual knowledge would merely heighten the element of foreseeability, which could then be considered by the fact finder. To draw the line at actual knowledge rather than what the insurer reasonably should have known would be an arbitrary compartmentalization, legislative in nature. Thus, whether there was actual knowledge, there were substantial material issues of fact pled in counts IV through VI of the complaint sufficient to state a cause of action upon which relief could be granted. We therefore conclude that, under these facts, where a policy of life insurance was procured on the decedent's life by someone other than the decedent, Met Life had a duty of care to ascertain that the decedent was aware of and agreed to the issuance of the policy.

We note that the duty to determine whether the insured is aware of a policy on his life is distinguished from the duty to investigate

discussed in *Brandt v. Time Insurance Co.*, 302 Ill. App. 3d 159, 164, 704 N.E.2d 843, 846 (1998), a case cited by defendant. In that case, the insurer was permitted to defend against payout of a policy by reason of false information submitted by the insured in the policy application. The facts of that case, however, unequivocally established that the policy was, in fact, procured by the insured and that the application information was supplied by the insured. The court merely held that a beneficiary will suffer the consequences of the insured's failure to provide truthful information on the policy application. This does not affect the insurer's duty to ascertain whether the purported insured was the real insured and whether the insured agreed to the procurement of the policy.

Secondly, in *Brandt*, there was no reason to doubt the answers provided by the applicant. As was stated in *National Boulevard Bank v. Georgetown Life Insurance Co.*, 129 Ill. App. 3d 73, 81, 472 N.E.2d 80, 86 (1984), cited by *Brandt*, "an insurance company need not make any independent investigation and may rely on the truthfulness of answers contained in the insurance application *where \*\*\* there is nothing to put it on notice that certain answers may be false.*" (Emphasis added.) According to *Georgetown*, an insurer will be held to a duty to investigate when put on notice that the veracity of the information provided by the applicant is questionable. As the facts pled in this case allege, Met Life issued a policy on the life of the insured on the basis of an insurance application which was completed by someone alleging to be the decedent's son. Met Life did not personally meet with the decedent about the policy and did not certify that the decedent signed the policy application. Under these circumstances, an issue of fact is raised as to whether the insurer was put on notice that an investigation was warranted since a third party was providing information about a life insurance policy on behalf of another person and naming himself the beneficiary of that policy. It is further arguable that the insurance company in this case was likewise put under notice and suspicion when it learned that, although the policy was purportedly procured on the decedent's behalf by his alleged son, the beneficiary was paying the policy premiums; the policy was written in excess of the amount generally allowed for a person in the decedent's income bracket; and the named beneficiary was the decedent's alleged son, instead of his wife. Notice was further heightened by discrepancies in the information provided in the insurance application compared to that provided during the medical screening and repeated phone calls from someone purporting to be the insured questioning the right of recovery in the event of accidental death or murder, which were, by Met Life's own admission in office communications, "strange enough that the case found its way into the Consulting Services area."

Lastly, plaintiff urges that liability can be exclusively predicated upon the allegation that the insured did not investigate the suspicious phone calls received after the policy was issued. We need not consider this issue at the present time, however, because although plaintiff raised the issue in his brief, he did not provide this court with any relevant argument or citation to authority, and thus, the issue is waived. 188 Ill. 2d R. 341 (e)(7); *Sinclair v. Berlin*, 325 Ill. App. 3d 458, 468, 758 N.E.2d 442, 451 (2001). Nevertheless, we note that where the insurance carrier takes all necessary and reasonable precautions at the time of its issuance of the policy to assure that the insured is aware and acquiesces to the policy, we are reluctant to recognize a follow-up duty to monitor the conduct of the beneficiary or to warn the insured of any potential risk to his life. Once a policy is properly issued, it may be reasonably argued that the insurer has no greater duty than any other person or entity to warn the insured of a potential risk to his life. See *Petersen v. U.S. Reduction Co.*, 267 Ill. App. 3d 775, 779, 641 N.E.2d 845, 848 (1994) ("[o]rdinarily, a party owes no duty of care to protect another from the harmful or criminal acts of third persons"). Thus, if plaintiff's claim rested upon that factor by itself, there would appear to be an insufficient basis to impose a duty upon the insurer to patrol the policy after its proper issuance. This is to be distinguished from a duty to respond to follow-up calls when, as here, it dovetails with the insurer's negligence in failing to ascertain the awareness and consent of the insured at the time of the policy issuance. It is in situations, such as that in the case at bar, where the insurer improperly issued the policy in the first instance that there would then be a continuing duty to ascertain whether the decedent knew of and consented to the policy. Thus, with respect to this issue, the judgment of the trial court is reversed.

## Summary Judgment

We must now turn to the issue of whether the trial court properly granted defendant's motion for summary judgment as to count VII of plaintiff's complaint. Summary judgment is appropriate when the pleadings, depositions, and admissions on file, viewed in the light most favorable to the nonmoving party, reveal that no genuine issue of material fact exists and that the moving party is entitled to judgment as a matter of law. *Ragan v. Columbia Mutual Insurance Co.*, 183 Ill. 2d 342, 349, 701 N.E.2d 493 (1998). Summary judgment is a drastic remedy that is allowable only when the right of the moving party is clear and free from doubt. *Jones*, 191 Ill. 2d at 291, 730 N.E.2d at 1127. A motion for summary judgment is reviewed *de novo*, and we may affirm the trial court's decision to grant summary judgment on

any basis in the record. *Castro v. Brown's Chicken & Pasta, Inc.*, 314 Ill. App. 3d 542, 552, 732 N.E.2d 37, 46 (2000).

In count VII of his complaint, plaintiff seeks to plead a right of recovery even under an "actual knowledge" requirement. Count VII alleges:

"76. That Defendant Met Life by and through it agent, the Defendant Imtiaz Sheik, had actual knowledge of the following:

a) That the insured *** had no knowledge that Met Life had agreed to issue, and had in fact issued, a policy of life insurance in the amount of $200,000.00 on his life.

b) That Muhammad U. Cheema, who paid the policy premium, actually signed the application for the policy, as though he were the insured, even though he was not the named insured.

c) That Muhammad U. Cheema was not related in any way to, much less the son of, the named insured.

d) That the person who took the physical examination needed for the issuance of the policy was not the insured as required but an imposter.

e) That Muhammad U. Cheema, the beneficiary under the policy, intended to murder the named insured as soon as the policy was issued in order to collect the policy benefits, namely $200,000.00.

f) That Muhammad U. Chemma [sic] did murder the named insured on February 25, 1993 shortly after he learned that the policy had issued on January 18, 1993."

A review of the pleadings, depositions, and admissions on file demonstrates that defendant affirmatively denied having any knowledge of the information set forth in count VII of plaintiff's complaint and that plaintiff failed to submit any evidence that affirmatively refuted defendant's denials. In fact, the evidence presented by plaintiff to establish defendant's actual knowledge consisted of the information, previously discussed in this opinion, which established that there were enough discrepancies and anomalies in the insurance application to put Met Life on notice that further inquiry was required. The fact that Met Life should have noticed and followed up on these issues does not establish that Met Life had actual knowledge of the information alleged by plaintiff in count VII. Accordingly, we conclude that no material issue of fact as to Met Life's actual knowledge existed in this case, and therefore, summary judgment as to count VII was proper as a matter of law.

## CONCLUSION

For the foregoing reasons, the judgment of the circuit court is af-

firmed in part, reversed in part and remanded for proceedings consistent with this opinion.

Affirmed in part and reversed in part; cause remanded.

BURKE, P.J., and CAHILL, J., concur.